Sheila A.G. Armbrust (CABN 265998)
sarmbrust@sidley.com
SIDLEY AUSTIN LLP
101 California Street, 35th Floor
San Francisco, CA 94111
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

Carter G. Phillips (admitted *pro hac vice*)
cphillips@sidley.com
Jennifer J. Clark (admitted *pro hac vice*)
jennifer.clark@sidley.com
Christopher A. Eiswerth (admitted *pro hac vice*)
ceiswerth@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

*Attorneys for Plaintiffs Alibaba Group Holding Limited*
*and Alibaba Group (U.S.) Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ALIBABA GROUP HOLDING LIMITED; ALIBABA GROUP (U.S.) INC., | Case No. 26-cv-6227-EKL |
| | Hon. Eumi K. Lee |
| Plaintiffs, | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| UNITED STATES DEPARTMENT OF DEFENSE a/k/a UNITED STATES DEPARTMENT OF WAR; PETE HEGSETH, *in his official capacity as Secretary of Defense*; STEPHEN FEINBERG, *in his official capacity as Deputy Secretary of Defense*; AND MICHAEL CADENAZZI, *in his official capacity as Assistant Secretary of Defense for Industrial Base Policy*, | DATE & TIME: To Be Determined LOCATION: Courtroom 7, 4th Floor **Complaint Filed on June 23, 2026** |
| Defendants. | |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that at a date and time to be determined by the Court, and as soon as counsel may possibly be heard before the Honorable Eumi K. Lee, in Courtroom 7 of the United States District Court for the Northern District of California, at the Robert F. Peckham Federal Building & United States Courthouse, 280 South 1st Street, San Jose, California 95113, Plaintiffs Alibaba Group Holding Limited and Alibaba Group (U.S.), Inc. (collectively, "Alibaba") will and hereby do move under Federal Rule of Civil Procedure 65 and Civil Local Rules 65-1 and 65-2 for a temporary restraining order and preliminary injunction to maintain the status quo and restrain or enjoin Defendants United States Department of Defense, Secretary Pete Hegseth, Deputy Secretary Stephen Feinberg, and Assistant Secretary Cadenazzi (collectively, "Defendants") from enforcing 10 U.S.C. § 4663's lobbyist-contracting ban, to order Defendants to remove Alibaba from the 1260H List, and to enjoin Defendants from enforcing Section 4663's ban against entities that contract with lobbyists who represent Alibaba.

Defendants' erroneous designation of Alibaba as a Chinese military company under Section 1260H triggers 10 U.S.C. § 4663's prohibition on the Department contracting with any entity that contracts with a covered lobbyist who also undertakes "lobbying activities" for any listed entity, including Alibaba. That restriction abridges Alibaba's First Amendment rights to speech and to petition the government effectively, and Defendants cannot satisfy the scrutiny that applies to such infringements. Alibaba has suffered and will continue to suffer irreparable harm because of Defendants' violation of its First Amendment rights through Section 4663's lobbyist-contracting bar. Accordingly, Alibaba respectfully requests that this Court enter an order enjoining or restraining the enforcement of 10 U.S.C. § 4663.

//

//

//

//

//

//

This Motion is based on this Notice; the accompanying Memorandum of Points and Authorities, the supporting declarations of Eric C. Pelletier and Sheila A.G. Armbrust; the proposed temporary restraining order and proposed order to show cause; all pleadings and papers filed in this action; and such additional papers and arguments as may be presented at or in connection with the hearing.

Date:  June 30, 2026

By: /s/ Sheila A.G. Armbrust
Sheila A.G. Armbrust

*Attorneys for Plaintiffs Alibaba Group Holding Limited and Alibaba Group (U.S.) Inc.*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STATEMENT OF THE ISSUES...........................................................................................2

STATEMENT OF FACTS ....................................................................................................2

    I.      Statutory Framework: Section 1260H and 10 U.S.C. § 4663......................................2

    II.     The Department Erroneously Designated Alibaba as a CMC. ....................................4

    III.    The Department's Designation Harms Alibaba. ........................................................6

LEGAL STANDARD............................................................................................................8

ARGUMENT .........................................................................................................................9

    IV.    Alibaba Is Likely to Succeed on the Merits of Its Claim Because Defendants Have Abridged Alibaba's First Amendment RightsWithout Justification. .......................................................................................9

        A.     The First Amendment protects the right to speak and petition the government effectively. ...............................................................................9

        B.     Section 4663's lobbyist-contracting ban violates Alibaba's First Amendment freedoms...................................................................................11

               1.     The lobbyist-contracting ban infringes Alibaba's core free-speech and petition rights. ............................................................. 11

               2.     The government cannot satisfy strict or intermediate scrutiny........ 14

        C.     Section 4663 is also facially overbroad. .........................................................18

    V.     The Remaining Factors Sharply Favor Injunctive Relief. .......................................20

    VI.    The Scope of the Requested Injunction Is Appropriate............................................21

CONCLUSION ....................................................................................................................23

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Bev. Ass'n v. City & Cnty. of S.F.*,
916 F.3d 749 (9th Cir. 2019) ...............................................................................21

*Autor v. Pritzker*,
740 F.3d 176 (D.C. Cir. 2014) ............................................................................19

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) .............................................................................21

*BE & K Constr. Co. v. NLRB*,
536 U.S. 516 (2002)............................................................................................10

*Borough of Duryea v. Guarnieri*,
564 U.S. 379 (2011).............................................................................9, 10, 12, 15

*Brinkman v. Budish*,
692 F. Supp. 2d 855 (S.D. Ohio 2010) ....................................................13, 16, 19

*Cal. Chamber of Com. v. Council for Educ. & Rsrch. on Toxics*,
29 F.4th 468 (9th Cir. 2022) ...............................................................................20

*Citizens United v. FEC*,
558 U.S. 310 (2010)..................................................................................10, 15, 17

*Cmty. House, Inc. v. City of Boise*,
490 F.3d 1041 (9th Cir. 2007) ............................................................................21

*Connick v. Myers*,
461 U.S. 138 (1983)............................................................................................10

*Disney Enters.. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) ................................................................................8

*E. R.R. Pres. Conf. v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961)............................................................................................10

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
146 S. Ct. 1114 (2026)........................................................................................11

*First Nat'l Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978).............................................................................................15

*FTC v. Super. Ct. Trial Lawyers Ass'n*,
  493 U.S. 411 (1990)................................................................................................................10

*Garcia v. Stillman*,
  661 F. Supp. 3d 1168 (S.D. Fla. 2023) ...............................................................................16, 19

*Healy v. James*,
  408 U.S. 169 (1972)................................................................................................................13

*Immigr. Defs. Law Ctr. v. Noem*,
  145 F.4th 972 (9th Cir. 2025) ..................................................................................................9

*Imperial Sovereign Ct. v. Knudsen*,
  170 F.4th 820 (9th Cir. 2026) ..................................................................................... *passim*

*Johnson v. Avery*,
  393 U.S. 483 (1969)................................................................................................................13

*Klein v. City of San Clemente*,
  584 F.3d 1196 (9th Cir. 2009) ...........................................................................................20, 22

*Legal Servs. Corp. v. Velazquez*,
  531 U.S. 533 (2001)............................................................................................................14, 15

*Marshall v. Balt. & Ohio R.R.*,
  57 U.S. 314 (1853)..................................................................................................................11

*McDonald v. Smith*,
  472 U.S. 479 (1985)................................................................................................................10

*Meyer v. Grant*,
  486 U.S. 414 (1988)............................................................................................................10, 13

*Miller v. Ziegler*,
  109 F.4th 1045 (8th Cir. 2024) ...........................................................................13, 15, 16, 19

*Mills v. Alabama*,
  384 U.S. 214 (1966)................................................................................................................10

*Minn. State Bd. of Cmty. Colls. v. Knight*,
  465 U.S. 271 (1984)................................................................................................................10

*Moody v. NetChoice*,
  LLC, 603 U.S. 707 (2024) ......................................................................................................18

*Mothershed v. Just. of Sup. Ct.*,
  410 F.3d 602 (9th Cir. 2005), *abrogated on other grounds by T.M. v. Univ. of Md. Med. Sys. Corp.*, 608 U.S. ---, 2026 WL 1751823 (U.S. June 18, 2026)................................................19

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)................................................................................................10

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958)................................................................................................11

*NAACP v. Button*,
371 U.S. 415 (1963)...........................................................................................11, 19

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982).......................................................................................10, 18, 19

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024)...........................................................................................14, 15

*Nken v. Holder*,
556 U.S. 418 (2009)................................................................................................21

*Perez v. Wolf*,
445 F. Supp. 3d 275 (N.D. Cal. 2020) .........................................................................9

*Perry v. Sindermann*,
408 U.S. 593 (1972)...........................................................................................19, 20

*Pierce v. Jacobsen*,
44 F.4th 853 (9th Cir. 2022) ..................................................................................13

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)................................................................................................13

*Thakur v. Trump*,
176 F.4th 1187 (9th Cir. 2026) ..............................................................................21

*U.S. Philips Corp. v. KBC Bank N.V.*,
590 F.3d 1091 (9th Cir. 2010) ................................................................................21

*United Mine Workers of Am. v. Ill. State Bar Ass'n*,
389 U.S. 217 (1967)................................................................................................13

*United States v. Hansen*,
599 U.S. 762 (2023)................................................................................................18

*United States v. Harriss*,
347 U.S. 612 (1954)................................................................................................17

*United States v. Stevens*,
559 U.S. 460 (2010)........................................................................................9, 18, 20

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989)................................................................................................18

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005) ......................................................................................21

*X Corp. v. Bonta*,
    116 F.4th 888 (9th Cir. 2024) ....................................................................................17

**Contitution and Statutes**

U.S. Const. amend. I ........................................................................................................9

Pub. L. No. 116-283, 134 Stat. 3388 (Jan. 1, 2021) (codified as amended at 10 U.S.C. § 113 note)
    ...................................................................................................................................2, 3

Pub. L. No. 118-31, 137 Stat. 136 (Dec. 22, 2023)........................................................3

Pub. L. No. 118-47, 138 Stat. 460 (Mar. 23, 2024) ......................................................3

2 U.S.C. § 1602 .................................................................................................... *passim*

5 U.S.C. § 705 .................................................................................................................9

10 U.S.C. § 113 ...............................................................................................................2

10 U.S.C. § 971 ........................................................................................................4, 12

10 U.S.C. § 4663 ................................................................................................. *passim*

Neb. Rev. Stat. § 49-1480 ..........................................................................................3, 17

Nev. Rev. Stat. § 493.118 ..............................................................................................3

Tex. Gov't Code § 809A *et seq*.....................................................................................3

Tex. Gov't Code § 2270 *et seq*.....................................................................................3

**Other Authorities**

86 Fed. Reg. 33994 (June 28, 2021) ..............................................................................5

89 Fed. Reg. 22698 (Apr. 2, 2024) ................................................................................5

90 Fed. Reg. 1105 (Jan. 7, 2025) ...................................................................................5

91 Fed. Reg. 35189 (June 10, 2026) ..............................................................................6

**Legislative History**

H.R. 8901 (2026) ............................................................................................................3

Mich. H. B. 5331 (2026) ................................................................................................3

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The First Amendment of the United States Constitution guarantees Alibaba Group Holding Limited and its U.S. subsidiary, Alibaba Group (U.S.) Inc. (collectively, "Alibaba"), the right to speak to the government and to petition for the redress of its grievances. Section 4663 takes that guarantee away.

Earlier this month, without notice or an opportunity to be heard, the Department of Defense branded Alibaba a "Chinese military company" and placed it on the Section 1260H List. Alibaba is challenging the lawfulness of that designation elsewhere in this litigation. Whatever the merits of that designation, though, it has triggered a distinct constitutional injury: Section 4663 strips a listed company of its ability to be heard by the very government that has acted against it.

The statute works by indirection. Under Section 4663, the Department may not contract with any company that retains a lobbying firm if that firm also represents a listed entity like Alibaba. So the moment a firm agrees to undertake "lobbying activities" for Alibaba—on any subject, from trade policy to intellectual property to the designation itself—it becomes radioactive to every other client it serves that contracts with the Department. No established lobbying firm could trade access to the tens of thousands of companies that contract with the Department for a single client. The predictable—and intended—result is that advocates are unwilling to carry Alibaba's message to Congress or the Executive Branch. And the injury has already been suffered because advocates who represented Alibaba for years have already terminated their representations, citing Section 4663.

What Alibaba loses is its voice across the whole of its dealings with the federal government—on legislation, on regulation, on the policies that shape its business. The freedom to speak and the right to petition are never more vital than when the government has moved against you. Section 4663 forecloses both—and not only as to Alibaba. It also silences a widening circle of others down the line: the firms punished for representing the company, and the contractors punished for associating with those firms, none of whom has been found to have done anything wrong.

The injury is not looming; it is here. The bar took effect at midnight on June 30, 2026. Alibaba's lobbyists withdrew in the days before the effective date, and every day that the statute

1

operates it deepens and spreads a loss of First Amendment freedoms that no later judgment can repair. Alibaba asks only to be allowed to speak through its qualified, chosen representatives. Because Section 4663 is unconstitutional as applied to Alibaba—and, in any event, facially overbroad—Alibaba is likely to succeed on the merits, and the remaining factors favor relief. Alibaba respectfully requests a temporary restraining order and preliminary injunction barring enforcement of Section 4663.

## STATEMENT OF THE ISSUES

1.    Whether the Court should issue a temporary restraining order or preliminary injunction because 10 U.S.C. § 4663 violates the First Amendment as applied to Alibaba.

2.    Whether the Court should issue a temporary restraining order or preliminary injunction because 10 U.S.C. § 4663 violates the First Amendment on its face.

## STATEMENT OF FACTS

**I.    Statutory Framework: Section 1260H and 10 U.S.C. § 4663.**

Section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 directs the Secretary of Defense to "identify each entity the Secretary determines, based on the most recent information available, is operating directly or indirectly in the United States or any of its territories and possessions, that is a Chinese military company." Pub. L. No. 116-283 § 1260H(a), 134 Stat. 3388, 3965 (Jan. 1, 2021) (codified as amended at 10 U.S.C. § 113 note). The Secretary must then publish that list of designated entities annually in the Federal Register. *See* Section 1260H(b)(1).[1]

The statute defines a "Chinese military company" ("CMC") in two relevant ways. *First*, a CMC means an entity "directly or indirectly owned by, controlled by, or beneficially owned by, affiliated with, or in an official or unofficial capacity acting as an agent of" a lengthy list of Chinese military, security, and industrial organs, including the People's Liberation Army ("PLA"), the Ministry of Industry and Information Technology ("MIIT"), and the State-Owned Assets

---

[1] Unless otherwise noted, all citations to Section 1260H refer to the current amended version codified at 10 U.S.C. § 113 (note).

Supervision and Administration Commission ("SASAC"). Section 1260H(g)(2)(B)(i)(I). *Second*, a CMC is an entity "identified as a military-civil fusion contributor to the Chinese defense industrial base," Section 1260H(g)(2)(B)(i)(II)—a category that in turn includes entities "managed, overseen, supervised by, otherwise under the control of, or affiliated with (including by means of formal participation in research partnerships and projects)" MIIT, among other organs. Section 1260H(g)(3)(B). Once the Secretary lists an entity as a CMC, the designation reaches any "wholly-owned or wholly-controlled subsidiary or wholly-owned or wholly-controlled affiliate of such an entity or any entity that owns in the aggregate, directly or indirectly, 50 percent or more of any [designated] entity or entities." Section 1260H(g)(2)(C).

Placement on the 1260H List carries restrictions. Beginning June 30, 2026, the Department of Defense may not "enter into, renew, or extend a contract for the procurement of goods, services, or technology with" a CMC. Pub. L. No. 118-31, § 805(a)(1)(A), 137 Stat. 136, 315 (Dec. 22, 2023) (codified at 10 U.S.C. note prec. § 4651). Nor may the Department of Homeland Security. *See* Pub. L. No. 118-47, § 536, 138 Stat. 460, 622 (Mar. 23, 2024). As of 2027, that contracting bar will extend downward through the supply chain. *See* 10 U.S.C. note prec. § 4651. Numerous States have imposed their own restrictions on listed entities. *See, e.g.*, Tex. Gov't Code § 809A *et seq.* (requiring divestment from listed companies); *id.* § 2270 *et seq.* (same under Exec. Order GA-48 (2024)); Nev. Rev. Stat. § 493.118(6)–(7) (imposing restrictions on unmanned vehicles sold, manufactured, or distributed by listed entities). Nebraska has enacted a statute that requires lobbyists for CMCs to file disclosures and "an affirmative acknowledgment by the lobbyist that such lobbyist is lobbying on behalf of, and thereby acting as an agent of, a foreign adversary of the United States." Neb. Rev. Stat. § 49-1480(1)(a)(vi). And Congress and state legislatures are actively considering additional restrictions against 1260H-listed entities. *See, e.g.*, H.R. 8901 (2026) (bar on federal research-collaboration assistance involving a listed entity); Mich. H. B. 5331 (2026) (bar on procurement or operation of drones manufactured by a listed entity).

The consequences do not stop at procurement and investment. Congress has gone further, effectively imposing limits on a listed entity's First Amendment rights to speak, to petition the government, and to associate with others in doing both. Section 4663 provides that "the Secretary

3

of Defense may not enter into a contract with an entity, a parent company of such entity, or a subsidiary of such entity [that] is a party to a contract with a covered lobbyist." 10 U.S.C. § 4663(a). A "covered lobbyist," in turn, is "an entity that engages in lobbying activities for any entity determined to be a Chinese military company listed in accordance with section 1260H." *Id.* § 4663 (d)(1). And "lobbying activities" include "any oral or written communication (including electronic communication)" to designated executive branch and legislative branch officials—and "preparation and planning activities, research and other background work that is intended" to assist such contacts—with regard to federal legislation, federal rules and regulations, executive orders, and nominations. 2 U.S.C. § 1602(7)–(8)(A); *see* 10 U.S.C. § 4663(d)(2) (incorporating definition through 10 U.S.C. § 971 prec. note).

The practical effect is to strip a listed entity of any meaningful ability to retain advocates to press its position before the government on public policy. The mechanism is indirect, but its consequence is not: the moment a firm undertakes "lobbying activities" for a CMC—even on a matter wholly unrelated to Section 1260H or national security issues and even if the individual would not qualify as a "lobbyist" under the Lobbying Disclosure Act, *see* 2 U.S.C. §§ 1602(10)— that firm becomes a "covered lobbyist" under Section 4663, and every other client it serves risks losing the ability to contract with the Department of Defense. No firm with defense-contractor business can absorb that risk for a single client. The predictable—and intended—result is that a listed entity loses the advocates it has and cannot retain new ones to speak for it.

## II.     The Department Erroneously Designated Alibaba as a CMC.

Alibaba is an e-commerce and cloud-computing company. It provides products, technology, infrastructure, and services to consumers and businesses solely for commercial and civilian use. Declaration of Eric C. Pelletier ("Pelletier Decl.") ¶ 4. Its e-commerce platforms connect merchants to consumers worldwide, and in 2024, U.S. brands generated over $50 billion in sales using Alibaba's infrastructure. *Id.* ¶ 5; *see id.*, Ex. A at 2. Alibaba Cloud provides commercial cloud services to companies—U.S. companies among them—operating in China and other global markets. *Id.* ¶ 7. And Alibaba's open-source AI models let users on its platforms build their own civilian applications. *Id.* ¶ 8.

For years, the Department did not regard Alibaba as a CMC. On January 7, 2025, the Department published its annual 1260H List, and—as in every prior iteration—Alibaba did not appear on it. *See* 90 Fed. Reg. 1105, 1105–06 (Jan. 7, 2025); *see also* 89 Fed. Reg. 22698, 22698–99 (Apr. 2, 2024); 86 Fed. Reg. 33994, 33994–95 (June 28, 2021).

Word of a reversal first surfaced in late 2025. On November 26, 2025, the media reported that in early October, Deputy Secretary Feinberg had advised the chairs of the House and Senate Armed Services Committees that the Department had determined that Alibaba and seven other companies were CMCs "in accordance with the statute" and that they "should be added to the 1260H list." Declaration of Sheila A.G. Armbrust ("Armbrust Decl."), Ex. B. Multiple Members of Congress then wrote to Secretary Hegseth, apparently confirming that reporting and applauding the decision to add Alibaba and the others to the list. *See id.*, Ex. C.

Alibaba promptly sought a meeting with the Department to address any questions about its business and affiliations. On January 21, 2026, Alibaba met with Department staff and explained that it is neither owned or controlled by nor affiliated with the Chinese government or military. *See* Pelletier Decl. ¶¶ 12–13. Alibaba is publicly traded on the New York and Hong Kong stock exchanges and is therefore subject to United States and Hong Kong disclosure, reporting, and audit requirements. *See id.* ¶ 9. It has a single class of ordinary shares and a broad shareholder base; no individual shareholder controls it; and no state-owned entity ("SOE") has ever controlled it. *See id.* ¶ 10. A ten-member board governs the company, and no director has a military background or affiliation. *See id.* ¶ 11.

Alibaba further explained that its business is strictly civilian and commercial. Its products and services are built for retail and enterprise-IT workloads—not for military, weapons, defense, or intelligence applications. *See id.* ¶ 13. Alibaba receives no military-civil fusion funding from the Chinese government and conducts no joint research with the Chinese military. *See id.* ¶¶ 14–15. It does not manufacture products for, or supply its products or services to, the Chinese military, and it holds none of the defense designations, military production licenses, or certifications that doing so would require. *See id.* ¶¶ 15–16. Nor is it registered on any platform demanding such designations, licenses, or certifications. *See id.* ¶ 16. In fact, Alibaba maintains a compliance program designed

5

to *prevent* military use of its products and services by screening and rejecting counterparties that present risk of military use, and its standard contracts forbid such use. *See id*. ¶ 17.

The Department identified no specific concerns in response. Yet on February 13, 2026 at 8:45 a.m., it posted a revised 1260H List for public inspection that designated Alibaba as a CMC on two grounds: that "Alibaba is indirectly affiliated with SASAC" and that "Alibaba is a military-civil fusion contributor to the Chinese defense industrial base because it is affiliated with MIIT." *See* Armbrust Decl., Ex. D. About 45 minutes later, the Department asked the Federal Register to withdraw the list without explanation. *See id.*, Ex. E. The Department did not provide the factual basis for the designation.

Alibaba nonetheless made a further submission on March 24, 2026, elaborating on its governance structure, demonstrating its lack of any connection to SASAC, and explaining that its relationship with MIIT is nothing more than the ordinary relationship between a regulator and a regulated party that every technology company operating in China has with that ministry. *See* Pelletier Decl. ¶ 22. Once more, the Department did not provide any substantive response, let alone identify any specific concern.

Then, on June 8, 2026, again without notice to Alibaba or the public, the Department posted for public inspection another revised 1260H List that again designated Alibaba on the same two grounds. Two days later, that list was published in the Federal Register and took effect. *See* 91 Fed. Reg. 35189 (June 10, 2026).

## III.    The Department's Designation Harms Alibaba.

The CMC designation inflicts immediate harm and threatens imminent, irreparable, and unconstitutional injury. For Alibaba, that harm is not speculative.

Since 1999, Alibaba has built a reputation for putting customers first and serving as a responsible partner in every country where it operates. Its platforms and technology help many U.S. merchants access the Chinese market of over 820 million consumers. *See* Pelletier Decl. ¶ 5; *see* p. 4, *supra*. The Department's branding of Alibaba as a CMC threatens to undo decades of that work in the eyes of the public and of governments. The risk has already begun to materialize: following the withdrawn February list and again after the June 8 list, the press has widely reported that Alibaba

is a military company or otherwise aids the Chinese military. *See, e.g.*, Armbrust Decl., Exs. B, F–I. Members of Congress have called Alibaba a "threat[] to our national security." *Id.*, Ex. J. None of that is true, and the resulting misperception stands to damage the company in lasting ways.

Beyond reputation, the designation concretely alters Alibaba's relationship with the U.S. government. For years, Alibaba has been—in the Department of Homeland Security's words—an "unwavering" partner that "has consistently proven its leadership in IPR [intellectual property rights] protection many times over" and has shown "dedication, professionalism, and overall leadership in IPR enforcement for more than two decades in both government and private sectors." Pelletier Decl. ¶ 18 & Ex. B. Alibaba has likewise engaged proactively with other agencies—among them the Federal Communications Commission, the Federal Trade Commission, and the Department of the Treasury—to share information and ensure compliance with applicable law. *See id.* ¶ 26.

Central to those efforts, Alibaba's Government Affairs team has long retained well-regarded lobbyists to help the company communicate with the U.S. government and navigate a constantly shifting regulatory landscape. *See id*. These advisors communicate on Alibaba's behalf with covered executive branch and legislative branch officials regarding federal legislation, rules, regulations, executive orders, and other government policies of commercial interest to the company. *See id*. ¶¶ 26–27. Specifically, they have advocated Alibaba's views regarding export expansion, small business export promotion, technology policy, access to U.S. capital markets, e-commerce-related issues, consumer-protection laws, and intellectual property. *See id*. ¶ 26. They assist Alibaba in preparing and planning such communications through research and other background work. *See id*. ¶ 27. Some of these relationships span more than a decade, and Alibaba's lobbyists have developed a deep understanding of the company and its culture—an understanding that lets them advocate more effectively for Alibaba and supply more complete and accurate information to the government. *See id.* ¶ 28.

Following Alibaba's designation, Section 4663 severs those relationships. Alibaba has been told that, because of the statute's sweeping lobbyist-contracting ban, all two dozen-plus retained lobbyists have withdrawn from representing the company as of June 30, 2026. *See id.* ¶¶ 28–30.

Those lobbyists have explained that continuing to represent Alibaba, would jeopardize not only their relationships with other clients but their firms' ability to represent any defense contractor at all—precisely the result the statute was designed to produce. *See id*. ¶¶ 28–29. Absent Section 4663, they would continue to represent Alibaba, and Alibaba would continue to retain them. *See id.* ¶ 30. Without them, Alibaba will be markedly less able to advocate for itself, navigate the regulatory environment, and, in short, effectively petition the government for redress of grievances. *See id.* ¶¶ 31–35. That is particularly harmful at a time when Congress is considering additional restrictions on listed entities and other agencies are considering additions to other lists that impose even more consequences. *See id*.

The full extent of the harm remains uncertain, and the uncertainty itself is harmful. The Department has not said how it will enforce Section 4663, but congressional leaders are already pressing for an expansive interpretation—one that would sweep into the provision's scope "coordination and other supporting work from research to planning that may assist in lobbying contacts" within the provision's scope. *See* Armbrust Decl., Ex. K. Taken together, these consequences amount to a very real abridgment of Alibaba's ability to advocate for itself, to petition the government, and to associate with advocates of its choosing.

## LEGAL STANDARD

"A party can obtain a preliminary injunction by showing that (1) it is 'likely to succeed on the merits,' (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in [its] favor,' and (4) 'an injunction is in the public interest.'" *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Alternatively, under the Ninth Circuit's sliding-scale approach, "if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Immigr. Defs. Law Ctr. v. Noem*, 145 F.4th 972, 986 (9th Cir. 2025) (quoting *All. for Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)). "When evaluating a preliminary injunction 'in the First Amendment context, the moving party bears the initial burden of making a

colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction.'" *Imperial Sovereign Ct. v. Knudsen*, 170 F.4th 820, 842 (9th Cir. 2026). Substantially the same standard applies to obtain a temporary restraining order. *See Perez v. Wolf*, 445 F. Supp. 3d 275, 292 (N.D. Cal. 2020) ("The standard for a TRO is the same as for a preliminary injunction.").

# ARGUMENT

## I.  Alibaba Is Likely to Succeed on the Merits of Its Claim Because Defendants Have Abridged Alibaba's First Amendment Rights Without Justification.

Section 4663's lobbyist-contracting ban infringes Alibaba's First Amendment rights to speak on issues of public concern, to petition the government for a redress of grievances, and to associate with advisors of its choice. The government cannot carry its heavy burden of showing that the ban is constitutionally justified. And the provision is unconstitutional not only as applied to Alibaba but also on its face. Alibaba is therefore likely to succeed on the merits of its First Amendment claim—and at a minimum raises serious questions going to the merits.

### A.  The First Amendment protects the right to speak and petition the government effectively.

The First Amendment commands that "Congress shall make no law … abridging the freedom of speech" or the right "to petition the Government for a redress of grievances." U.S. Const. amend. I. At its core, that guarantee means "that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010). Speech and petition are "cognate rights," and together, they ensure that all persons may express their views on political matters—to the public and to the government. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011).

The Speech Clause "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269–70 (1964); *accord Mills v. Alabama*, 384 U.S. 214, 218 (1966) ("[T]here is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs."). Speech that urges "political change" and discusses "the merits of the

9

proposed change" is "core political speech," *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988), as is all "discussion[] of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes," *Mills*, 384 U.S. at 218–19. Such speech "is the essence of self-government" and has "always rested on the highest rung of the hierarchy of First Amendment values." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (cleaned up). It is therefore "entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983).

The right to petition stands on equal footing. It "is cut from the same cloth as the other guarantees of [the First] Amendment, and is an assurance of a particular freedom of expression." *McDonald v. Smith*, 472 U.S. 479, 482 (1985). It "allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives," *Guarnieri*, 564 U.S. at 388, for in a republic, "the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives," *E. R.R. Pres. Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137 (1961). The right "extends to all departments of the Government." *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002); *see FTC v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 426 (1990) (recognizing that efforts "to lobby [government] officials to enact favorable legislation … were fully protected by the First Amendment"). Government officials may be under no obligation "to listen or respond," *Minn. State Bd. of Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984), but the government may not cut off the expression of opinions or "disputed facts" or the demand for change, *see, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 369 (2010) (observing that "Congress has no power to ban lobbying itself").

"Both speech and petition are integral to the democratic process," *Guarnieri*, 564 U.S. at 388, and neither is diminished when exercised through "orderly group activity," including representation by counsel. *NAACP v. Button*, 371 U.S. 415, 430 (1963). The principle is an old one. More than 170 years ago, the Court recognized that "[a]ll persons whose interests may in any way be affected by any public or private act of the legislature, have an undoubted right to urge their claims and arguments, either in person *or by counsel professing to act for them*, before legislative committees, as well as in courts of justice." *Marshall v. Balt. & Ohio. R.R.*, 57 U.S. 314, 334–35

(1853) (emphasis added). The modern cases say the same: "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). "Without such a right, no two men could safely share the same soapbox, no two women the same church," and "the right to petition would amount to nothing more than the power to sign one's own name alone." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1122 (2026).

In short, the First Amendment secures not only the freedom to speak and to petition, but also the freedom to do so effectively—through advocates of one's own choosing—and it does so most insistently when the speaker seeks to contest the government's own action against it.

**B.    Section 4663's lobbyist-contracting ban violates Alibaba's First Amendment freedoms.**

As applied to Alibaba, Section 4663 burdens core political speech and the right to petition the government effectively. It does so by coercing private third parties to sever their association with advocates who represent Alibaba; this in turn coerces those advocates to cease their representation of Alibaba, leaving the company cut off from those who might represent its views in Congress or with federal agencies. Because this statute burdens political speech and the fundamental right to petition, it can survive only if the government satisfies strict scrutiny. The government cannot carry that heavy burden.

**1.    The lobbyist-contracting ban infringes Alibaba's core free-speech and petition rights.**

Section 4663 cuts Alibaba off from those who would be otherwise willing to advocate its positions before the federal government—on legislation, rules, regulations, executive orders, and federal policies. The result is a straightforward abridgment of core political speech and Alibaba's right to petition the government.

The statute bars the Secretary of Defense from "enter[ing] into a contract with an entity, a parent company of such entity, or a subsidiary of such entity if such entity is a party to a contract with a covered lobbyist." 10 U.S.C. § 4663(a). A "covered lobbyist" is "an entity that engages in lobbying activities" for a designated CMC. *Id.* § 4663(d)(1). And "lobbying activities" are core

11

political speech. They include, subject to limited exceptions, "oral or written communication[s]" to government officials "with regard to" "the formulation, modification, or adoption of Federal legislation," any "Federal rule, regulation, Executive order, or any [federal government] program," or "the nomination or confirmation of a person for a position subject to confirmation by the Senate." 2 U.S.C. § 1602(7), (8)(A)(i)–(iv); *see* 10 U.S.C. § 4663(d)(2) (incorporating Lobbying Disclosure Act definitions of "lobbying activities" and "lobbying contacts" through 10 U.S.C. § 971 prec. note). What Section 4663 addresses therefore is not some commercial byproduct of Alibaba's expression but communication with the government on questions of federal law and policy—core political expression directed at the government itself. *See Guarnieri*, 564 U.S. at 388.

Read together, these provisions restrict Alibaba's capacity to speak and petition by confronting every lobbyist and lobbying firm with a forced choice. The moment a firm agrees to represent Alibaba, it becomes a covered lobbyist—and every one of its clients that holds or seeks a defense contract loses the ability to contract with the Department. To represent Alibaba, then, a firm must give up every defense-contractor client it has or hopes to have. Presented with the choice between a single client and access to tens of thousands of companies that contract with the Department, a rational firm—and certainly any established firm—keeps its business, and a designated company like Alibaba is left with no one to carry its voice to the government on legislation, rules, regulations, executive orders, or federal policies. Its core political speech and its ability to petition effectively are stifled. And that injury is not at all hypothetical. Lobbyists who have represented Alibaba for years have ended their representations as of June 30, 2026, because of Section 4663. Pelletier Decl. ¶ 28.

That the statute stops short of a flat prohibition makes it no less an abridgment. The First Amendment protects the freedoms of speech and petition "not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Healy v. James*, 408 U.S. 169, 183 (1972) (quoting *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960)). "Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565–66 (2011). The First Amendment would "be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as

12

no law is passed that prohibits free speech, press, petition, or assembly as such." *United Mine Workers of Am. v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967).

Section 4663 does not need to outright forbid Alibaba from lobbying or retaining lobbyists because it accomplishes the same end by a stealthier route—making representation of Alibaba so costly to any capable advocate that it is difficult to imagine any who will undertake it. It thus silences Alibaba by ensuring that no voice is raised on its behalf. A law that deprives a company of its most trusted and effective advocates has burdened its expression as surely as a direct ban. *See Miller v. Ziegler*, 109 F.4th 1045, 1049–50 (8th Cir. 2024); *cf. Johnson v. Avery*, 393 U.S. 483, 487 (1969) (invalidating a ban on jailhouse lawyers because, without their help, illiterate prisoners' "possibly valid constitutional claims will never be heard in any court").

*Meyer* condemned precisely this burden. There, a State forbade the proponents of a ballot initiative to pay the circulators who gathered the signatures their measure needed. 486 U.S. at 415–16. The Court held the prohibition unconstitutional because it "limit[ed] the number of voices who will convey [the proponents'] message and the hours they can speak," and so restricted political expression in "an area in which the importance of First Amendment protections is 'at its zenith.'" *Id.* at 422–23, 425; *accord Pierce v. Jacobsen*, 44 F.4th 853, 866 (9th Cir. 2022) (same for ban on non-resident petition circulators); *Miller*, 109 F.4th at 1049–50 (same for lobbyist ban). The First Amendment, the Court explained, "protects [a speaker's] right not only to advocate [its] cause but also to select what [it] believe[s] to be the most effective means for so doing." *Meyer*, 486 U.S. at 424; *see Brinkman v. Budish*, 692 F. Supp. 2d 855, 862 (S.D. Ohio 2010) (collecting cases). Section 4663 inflicts the same injury. It limits not only the advocate Alibaba may retain, but also those who help with certain "preparation and planning activities, research[,] and other background work" that come before a single word to a single official. 2 U.S.C. § 1602(7) (defining "lobbying activities").

That the penalty reaches Alibaba through third parties also does not save the law. "[A] government official cannot do indirectly what she is barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). The First Amendment "prohibits government officials from wielding their power selectively to punish or suppress speech, directly or ... through private intermediaries." *Id.* at 198. In *Vullo*, a state regulator allegedly leveraged her authority over insurers

to pressure them into cutting ties with the National Rifle Association, suppressing advocacy she could not have banned outright. *Id.* at 183–85. The Court held that such conduct crossed the line because "[a] government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Id.* at 186, 190. Section 4663 follows the same design—save that Congress has written the coercion into the statute rather than leaving it to an official's discretion. By barring the Department from contracting with any entity that retains a lobbying firm representing Alibaba, the statute conscripts those contractors and firms to do what the government may not: silence Alibaba's petitioning by withdrawing the very advocates through whom it would petition.

Nor does the contracting power supply a refuge. "Where private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548–49 (2001). And the Court has been especially "vigilant when Congress imposes rules and conditions which in effect insulate its own laws from legitimate ... challenge." *Id.* at 548. The effort at insulation here is plain: having branded Alibaba a Chinese military company, Section 4663 now forecloses not only the "lobbying activities" through which Alibaba (or any designated entity) might obtain delisting, but also the main way that it expresses its views on legislation, on regulation, on the policies that shape its business—all at the moment it most needs to be heard. Doing so infringes the First Amendment.

### 2. The government cannot satisfy strict or intermediate scrutiny.

Having shown that Section 4663 burdens its core political speech and right to petition, Alibaba is likely to prevail on the merits unless the government proves that the statute's application to Alibaba is constitutional. *See Imperial Sovereign Ct.*, 170 F.4th at 842. That requires satisfying strict scrutiny: the government must show that burdening Alibaba's rights "furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 558 U.S. at 340. The lobbyist-contracting bar advances no compelling interest. And even if it did, the provision is so grossly overinclusive that it would fail even intermediate scrutiny, burdening as it does substantially more speech than necessary.

//

**Strict scrutiny applies.** As shown above, Section 4663 burdens Alibaba's political speech and right to petition—expression that receives the highest First Amendment protection. "Laws that burden political speech are 'subject to strict scrutiny.'" *Citizens United*, 558 U.S. at 340; *accord Miller*, 109 F.4th at 1050 (applying strict scrutiny to lobbying ban).

Section 4663 also demands that scrutiny because it burdens Alibaba's expression by reason of who Alibaba is. The statute singles out advocacy "for any entity determined to be a Chinese military company" under Section 1260H, 10 U.S.C. § 4663(d)(1), defining the expression it penalizes by the identity of the company on whose behalf the advocate speaks—and foreclosing Alibaba's own petitioning by penalizing anyone who would carry its message. Government efforts to control "the speakers who may address a public issue" are suspect, *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 785 (1978), because "restrictions based on the identity of the speaker are all too often simply a means to control content," *Citizens United*, 558 U.S. at 340.

**Section 4663 does not serve a compelling interest.** The interest that the lobbyist-contracting ban actually advances is one the First Amendment forbids the government from pursuing—the silencing of disfavored speakers. The government may not "wield[] [its] power selectively to punish or suppress speech, directly or … through private intermediaries." *Vullo*, 602 U.S. at 198. And Congress "has no power to ban lobbying itself." *Citizens United*, 558 U.S. at 369. Insulating the legislative and executive branches from a listed company's petitioning is not a weighty interest. Indeed, the Declaration of Independence was born in part from the King's failure to consider or respond to the colonists' grievances. *See Guarnieri*, 564 U.S. at 396. Thus, "the suppression of ideas thought inimical to the Government's own interest" cannot supply the compelling justification that strict scrutiny demands. *Velazquez*, 531 U.S. at 549.

**Section 4663 is not narrowly tailored.** Even if the government could establish that Section 4663 actually advances a compelling interest, the statute is so overinclusive that it cannot withstand scrutiny. A narrowly tailored restriction burdens no more speech than necessary to serve the asserted interest. *See Imperial Sovereign Ct.*, 170 F.4th at 847 (citing *United States v. Playboy Entmt. Grp., Inc.*, 529 U.S. 803, 813 (2000)). Section 4663 burdens vastly more. Whatever interest the

15

government might assert, the lobbyist-contracting bar reaches an enormous swath of advocacy that implicates no cognizable concern at all.

The statute reaches all "lobbying activities" undertaken for a listed company, on any subject whatever—including federal legislation, rules, regulations, executive orders, and federal policies. 2 U.S.C. § 1602(8)(A). A firm that advocates for Alibaba on small business export promotion, on intellectual property issues, or on the regulation of online marketplaces—subjects with no bearing on defense contracting—becomes a "covered lobbyist," and its defense-contractor clients lose their eligibility just the same. The bar does not even stop at advocacy itself. It extends to certain "preparation and planning activities, research and other background work" that precede any contact with any covered official. *Id.* § 1602(7). A statute that sweeps in the entire universe of a company's political advocacy—and the groundwork beneath it—to address some unspecified sliver of arguable concern is the antithesis of narrow tailoring. *See Imperial Sovereign Ct.*, 170 F.4th at 862–63 (restriction improperly "overinclusive" where it "covers expression" far beyond the asserted justification); *see also Miller*, 109 F.4th at 1052–53 (concluding overinclusive lobbying ban was not narrowly tailored); *Brinkman*, 692 F. Supp. 2d at 864–65 (same); *Garcia v. Stillman*, 661 F. Supp. 3d 1168, 1183–85 (S.D. Fla. 2023) (same).

That overbreadth is fatal on its own because the government cannot show that a far less restrictive alternative would not serve any interest it might assert. "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Imperial Sovereign Ct.*, 170 F.4th at 847 (quoting *Playboy*, 529 U.S. at 813). Here, obvious alternatives exist for any asserted interest. If the government's concern is, for example, that officials and the public know when an advocate speaks for a listed company, it may require appropriate disclosure rather than forbid the advocacy altogether. Nebraska has done exactly that, requiring a lobbyist for a listed Chinese military company to register and disclose certain information—without barring anyone from contracting with that lobbyist or stripping the listed company of representation. *See* Neb. Rev.

//

//

//

16

Stat. § 49-1480(1)(a)(vi).[2] Disclosure serves any legitimate informational interest directly, while leaving the channels of petition open. *See Citizens United*, 558 U.S. at 369. That Congress chose prohibition over disclosure—and chose to penalize a listed company's advocates rather than regulate the advocacy—confirms that Section 4663 is not tailored to any informational end.

Nor, for example, is Section 4663 sufficiently tailored to further some appropriate interest related to federal contracting. Congress may attach conditions that "define the limits of the government spending program," but it may not "leverage funding to regulate speech outside the contours of the program itself." *Imperial Sovereign Ct.*, 170 F.4th at 866 (quoting *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013)). Section 4663 does precisely that. It does not regulate what a defense contractor does under its contract, or even what the contractor itself may say; it reaches outward to penalize a contractor for associating with a third party—a lobbying firm—who advocates on behalf of another party—the listed company. A condition that tethers a contractor's eligibility to its associations and the political speech of entities with no relationship to the contract at all crosses the line and leverages the contracting power far "outside the contours of the program itself." *Id.*

Because Section 4663 burdens substantially more speech than any interest could require, it fails strict scrutiny—and for the same reasons, it would fail even the intermediate scrutiny applied to everyday content-neutral restrictions. By burdening Alibaba's right to speak and petition on any subject, including legislation, regulations, and nominations unrelated to defense contracting, the statute "burden[s] substantially more speech than is necessary" to further any legitimate government interests. *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). And by treating any firm that performs prefatory work—not just those who advocate directly to Congress and the Administration on a listed entity's behalf—as a "covered lobbyist," the law does not "leave open alternative

---

[2] Nebraska requires the disclosure to include "an affirmative acknowledgment by the lobbyist that such lobbyist is lobbying on behalf of, and thereby acting as an agent of, a foreign adversary of the United States." Neb. Rev. Stat. § 49-1480(1)(a)(vi). That aspect of the law may present its own First Amendment issues, *see, e.g.*, *X Corp. v. Bonta*, 116 F.4th 888, 900–03 (9th Cir. 2024), but the Supreme Court has long recognized that *appropriate* lobbying disclosure requirements are constitutional, *see United States v. Harriss*, 347 U.S. 612, 625–26 (1954).

17

channels of communication." *Id.* at 802. Alibaba is therefore likely to succeed on the merits of its as-applied First Amendment challenge. At a minimum, it has raised serious questions going to the merits.

### C.       Section 4663 is also facially overbroad.

The same features that render Section 4663 unconstitutional as applied to Alibaba pervade the statute's operation across the board. A law is overbroad, and invalid in its entirety under the First Amendment, when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473; *see Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). The doctrine exists to provide "breathing room for free expression." *United States v. Hansen*, 599 U.S. 762, 769 (2023). Because "[o]verbroad laws may deter or 'chill' constitutionally protected speech" and cause "would-be speakers [to] remain silent," the Court may consider the "rights of the silenced"—not just the parties before it. *Id.* at 769–70 (cleaned up). Judged against that standard, Section 4663 chills protected rights to speech, petition, and association on a sweeping scale, and its unconstitutional applications substantially outweigh its legitimate ones.

Section 4663 suppresses protected First Amendment activity at every link in the chain it regulates. First, as discussed above, the statute burdens the rights of listed companies to engage in political speech and to petition the government—rights afforded the highest degree of protection under the First Amendment—by foreclosing their ability to retain their advocates to lobby on their behalf, on any subject, before any covered official. *See* Part I.B.1, *supra*. Designation as a CMC turns on ownership, control, and affiliation, not on any finding that an entity holds "unlawful aims and goals, and a specific intent to further those illegal aims." *Claiborne Hardware*, 458 U.S. at 920. Yet Section 4663 visits on every listed entity a penalty the First Amendment generally reserves for those who have been shown to pursue such ends. Even as to companies properly designated as CMCs (unlike Alibaba), the government cannot show that foreclosing their petitioning on political subjects unrelated to national defense serves a compelling interest or is narrowly tailored to one— a failure that inheres in the statute's design. *See* Part I.B.2, *supra*.

Second, the statute burdens the lobbyists' and lobbying firms' own First Amendment rights by penalizing the firms for representing disfavored clients and forcing them to abandon that

representation or forfeit their other business. As the "government [has itself] acknowledged," "registered lobbyists are protected by the First Amendment right to petition." *Autor v. Pritzker*, 740 F.3d 176, 182 (D.C. Cir. 2014) (citing *Liberty Lobby, Inc. v. Pearson*, 390 F.2d 489, 491 (D.C. Cir. 1968) (Burger, C.J.)). Statutes that bar lobbyists from representing particular clients infringe that right and the corresponding freedom of association. *See Miller*, 109 F.4th at 1050–51; *Garcia*, 661 F. Supp. 3d at 1181–83; *Brinkman*, 692 F. Supp. 2d at 862; *cf. Mothershed v. Just. of Sup. Ct.*, 410 F.3d 602, 611 (9th Cir. 2005) (recognizing that "at least as a general matter," "the 'right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition.'"), *abrogated on other grounds by T.M. v. Univ. of Md. Med. Sys. Corp.*, 608 U.S. ---, 2026 WL 1751823 (U.S. June 18, 2026). Section 4663 by its terms prevents lobbyists from associating with listed entities to "seek through lawful means to achieve legitimate political ends." *Button*, 371 U.S. at 430. The Court has recognized that "guilt by association alone, without [establishing] that an individual's association poses the threat feared by the Government, is an impermissible basis upon which to deny First Amendment rights." *Claiborne Hardware*, 458 U.S. at 919 (cleaned up). Here too, the government cannot show that this burden advances a compelling interest or is narrowly tailored.

Third, the statute limits a defense contractor's eligibility to do business with the Department—not based on anything the contractor itself did or said, nor even on any illegal conduct by its agents, but because "such entity is a party to a contract with a covered lobbyist," 10 U.S.C. § 4663(a). The statute thus conditions a contractor's ability to contract with the Department based on forgoing the exercise of First Amendment rights to petition through and associate with its preferred advocate. But the Supreme Court has long held that, whether or not a person has a "'right' to a valuable government[] benefit," the government may not deny that "benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Section 4663 does just that, penalizing the contractor for retaining a firm that also represents disfavored clients. Because the government could not bar the lobbyist from doing so directly, *see* Part I.A, *supra*, it may not accomplish the same end through a contracting condition: to permit it

19

"would allow the government to produce a result which [it] could not command directly." *Perry*, 408 U.S. at 597 (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)).

These are not occasional misapplications at the statute's margins; they are how Section 4663 ordinarily operates. Even crediting the government with a legitimate interest in some narrow core of applications, that core is dwarfed by the statute's actual reach. Section 4663 reaches every firm that lobbies for any of the dozens of entities on the 1260H List, plus additional unlisted subsidiaries, on every subject of federal policy, including matters with no conceivable connection to national defense; it reaches certain "preparation and planning activities, research and other background work" that precede any contact with any covered official, 2 U.S.C. § 1602(7); and it does so by operating on the contractors whose only relevant act is to associate with such a firm. The statute's protected applications are not a marginal fringe of an otherwise valid law—they are the heart of what it does. Judged "in relation to the statute's plainly legitimate sweep," its unconstitutional applications are substantial. *Stevens*, 559 U.S. at 473. Section 4663 is therefore facially overbroad and may not be enforced.

## II.    The Remaining Factors Sharply Favor Injunctive Relief.

The remaining factors follow from Alibaba's First Amendment showing, and each independently supports an injunction.

Begin with irreparable harm. The Supreme Court and the Ninth Circuit "have repeatedly held that 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). That resolves this factor. *See Cal. Chamber of Com. v. Council for Educ. & Rsrch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) ("Irreparable harm is relatively easy to establish in a First Amendment case."). As shown above, Alibaba has raised at least "[a] colorable First Amendment claim"—indeed, far more—that its CMC designation has caused and will continue to cause an abridgement of its freedom to speak, petition the government, and associate, all flowing from Section 4663's lobbyist-contracting ban. *Thakur v. Trump*, 176 F.4th 1187, 1205 (9th Cir. 2026) (quoting *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014)). Having done so, Alibaba has necessarily shown "irreparable injury sufficient to merit the

20

grant of relief." *Id.*; *accord Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005). The injury is not only ongoing but escalating: Alibaba's lobbyists have severed their representation as of June 30, 2026, and no damages remedy could restore relationships built over more than a decade or undo the loss of Alibaba's voice before the government in the interim.

The final two factors merge when the government is the nonmovant, *see Nken v. Holder*, 556 U.S. 418, 435 (2009); *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023), and they too point decisively toward relief. The Ninth Circuit has held repeatedly that showing a likelihood of success on a First Amendment claim "compels a finding" for plaintiff on the equitable factors. *Am. Bev. Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 758 (9th Cir. 2019). At a minimum, Alibaba has "raised serious First Amendment questions," so "the balance of hardships tips sharply in [its] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007). And "it is always in the public interest to prevent the violation of a party's constitutional rights." *Am. Bev. Ass'n*, 916 F.3d at 758; *see Thakur*, 176 F.4th at 1205 (The government "cannot suffer harm from an injunction that merely ends an unlawful practice." (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

### III.     The Scope of the Requested Injunction Is Appropriate.

Preliminary injunctive relief "preserve[s] the status quo and the rights of the parties" pending resolution of the merits. *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010). The "scope of a preliminary injunction must be no broader than necessary to provide complete relief to the named plaintiffs," though within that limit, the district court "has considerable discretion in fashioning suitable relief and defining the terms of an injunction." *Thakur*, 176 F.4th at 1206. Alibaba's requested relief is matched to, and no broader than, the violation it remedies.

Section 4663 is now in force, and its injury is not a future prospect but a present and worsening reality. Each day the bar operates, Alibaba stands stripped of the advocates through whom it would speak and petition, and that loss of First Amendment freedoms is, "for even minimal periods of time," irreparable. *Klein*, 584 F.3d at 1207–08. Alibaba therefore seeks a temporary restraining order and preliminary injunction to halt the violation.

The designation under Section 1260H is what activates Section 4663: only once Alibaba was listed could the bar fall on the contractors who retain lobbying firms that also represent Alibaba.

21

Removing the designation is therefore the most direct way to lift the harm to Alibaba. The Court should order Defendants to remove Alibaba from the 1260H List, at least temporarily. That relief would resolve the injury at its source: with the designation lifted, Section 4663's bar would no longer impose the improper burden on Alibaba's free-speech and petition rights, and any defense contractor—and any lobbying firm Alibaba might retain—would know that representing Alibaba could not cost it the ability to contract with the Department. The order would be clear, administrable, and readily enforceable.

At a minimum, the Court should enjoin Defendants from applying or enforcing Section 4663 to render any entity ineligible to contract with the Department by reason of that entity's—or its parent's or subsidiary's—contractual relationship with a firm that engages in lobbying activities for Alibaba, and from treating any such firm as a "covered lobbyist" on account of its representation of Alibaba. That relief is narrow and surgical and mitigates the harm imposed on Alibaba.

Should the Court further conclude that Section 4663 is facially overbroad, *see* Part II.C, *supra*, the appropriate remedy is to enjoin the statute's enforcement altogether. A statute that is invalid because its unconstitutional applications are substantial "cannot be enforced against anyone," *Imperial Sovereign Ct.*, 170 F.4th at 845, and an injunction limited to Alibaba would leave the overbroad statute to continue chilling the contractors', firms', and listed entities' freedoms of speech, petition, and association that it sweeps in. In this circumstance, enjoining Section 4663 in full is itself appropriate relief because the statute is invalid as a whole.

//
//
//
//
//
//
//
//
//

22

**CONCLUSION**

For the foregoing reasons, the Court should grant Alibaba's motion for a temporary restraining order and preliminary injunction.

Date: June 30, 2026                          SIDLEY AUSTIN LLP


*/s/ Sheila A.G. Armbrust*
 Sheila A.G. Armbrust (CABN 265998)
Carter G. Phillips (admitted *pro hac vice*)
Jennifer J. Clark (admitted *pro hac vice*)
Christopher A. Eiswerth (admitted *pro hac vice*)

*Attorneys for Plaintiffs Alibaba Group Holding Limited and Alibaba Group (U.S.) Inc.*

## <u>GENERATIVE AI CERTIFICATION</u>

I certify that any content generated by artificial intelligence in the foregoing motion and accompanying papers has been personally verified for accuracy and any prompts have been retained.

/s/ Christopher A. Eiswerth
Christopher A. Eiswerth

*Attorney for Plaintiffs Alibaba Group Holding Limited and Alibaba Group (U.S.) Inc.*

24