Sheila A.G. Armbrust (CABN 265998)
sarmbrust@sidley.com
SIDLEY AUSTIN LLP
101 California Street, 35th Floor
San Francisco, CA 94111
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

Carter G. Phillips (admitted *pro hac vice*)
cphillips@sidley.com
Jennifer J. Clark (admitted *pro hac vice*)
jennifer.clark@sidley.com
Christopher A. Eiswerth (admitted *pro hac vice*)
ceiswerth@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

*Attorneys for Plaintiffs Alibaba Group Holding Limited and Alibaba Group (U.S.) Inc.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

ALIBABA GROUP HOLDING LIMITED; ALIBABA GROUP (U.S.) INC.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF DEFENSE a/k/a UNITED STATES DEPARTMENT OF WAR; PETE HEGSETH, *in his official capacity as Secretary of Defense*; STEPHEN FEINBERG, *in his official capacity as Deputy Secretary of Defense*; AND MICHAEL CADENAZZI, *in his official capacity as Assistant Secretary of Defense for Industrial Base Policy*,

Defendants.

Case No. 26-cv-6227-EKL

Hon. Eumi K. Lee

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

DATE & TIME: March 10, 2027 at 10:00 a.m.
LOCATION: Courtroom 7, 4th Floor

**Complaint Filed on June 23, 2026**

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on March 10, 2027 at 10:00 a.m., or as soon thereafter as counsel may be heard before the Honorable Eumi K. Lee, in Courtroom 7 of the United States District Court for the Northern District of California, at the Robert F. Peckham Federal Building & United States Courthouse, 280 South 1st Street, San Jose, California 95113, Plaintiffs Alibaba Group Holding Limited and Alibaba Group (U.S.), Inc. (collectively, "Alibaba") will and hereby do move the Court for an order under Federal Rule of Civil Procedure 56 granting summary judgment to Alibaba on each claim and against Defendants United States Department of Defense, Secretary Pete Hegseth, Deputy Secretary Stephen Feinberg, and Assistant Secretary Cadenazzi; declare that the Department's designation of Alibaba as a "Chinese military company" under Section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 violated the Administrative Procedure Act; hold unlawful and set aside that designation; declare 10 U.S.C. § 4663 unconstitutional and permanently enjoin Defendants from enforcing 10 U.S.C. § 4663's lobbyist-contracting ban; and declare Section 1260H void for vagueness.

This motion is based on this Notice; the accompanying Memorandum of Points and Authorities; the supporting declaration of Eric C. Pelletier; the supporting declaration of Christopher A. Eiswerth; the separate statement of issues and facts; the proposed order granting summary judgment to Alibaba and against Defendants and declaring and holding unlawful and setting aside Alibaba's designation under Section 1260H; all pleadings and papers filed in this action; and such additional papers and arguments as may be presented at or in connection with the hearing. Further, consistent with Section VIII of the Court's civil standing order, Alibaba certifies that counsel met and conferred with counsel for the government regarding this motion via videoconference on November 2, 2026 regarding this motion.

Date: November 9, 2026

By: */s/ Christopher A. Eiswerth*
Sheila A.G. Armbrust (CABN 265998)
Carter G. Phillips (admitted *pro hac vice*)
Jennifer J. Clark (admitted *pro hac vice*)
Christopher A. Eiswerth (admitted *pro hac vice*)

*Attorneys for Plaintiffs Alibaba Group Holding Limited and Alibaba Group (U.S.) Inc.*

## TABLE OF CONTENTS


INTRODUCTION ........ 1

STATEMENT OF THE ISSUES ........ 2

BACKGROUND ........ 3

A. Statutory Background ........ 3

B. Factual Background ........ 4

C. Procedural Background ........ 6

LEGAL STANDARD ........ 10

ARGUMENT ........ 11

I. The Department Has Violated The Administrative Procedure Act. ........ 11

A. The Department failed to provide an adequate explanation for its decision. 11

B. The Department's indirect-affiliation theory is contrary to law. ........ 13

C. The Department's SASAC finding is arbitrary and capricious. ........ 16

1. The record does not show a close association between Alibaba and SASAC. ........ 16

2. The record does not show a close association between Alibaba and the designated SOEs. ........ 17

D. The Department's military-civil fusion contributor finding is arbitrary and capricious. ........ 21

II. The Department Has Violated Due Process. ........ 24

A. The Department did not provide notice or an opportunity to be heard. ........ 25

B. The Department's error was not harmless. ........ 26

C. Vacatur is the appropriate remedy. ........ 27

III. Section 4663's Lobbyist-Contracting Ban Violates The First Amendment. ........ 28

A. The statute burdens First Amendment freedoms. ........ 28

B. Strict scrutiny applies. ........ 30

C. The government cannot satisfy strict or intermediate scrutiny. ........ 31

D. The statute is facially overbroad. ........ 32

IV. Section 1260H Is Void for Vagueness. ........ 34

CONCLUSION ........ 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............ 10

*Anthropic PBC v. Dep't of War*,
825 F. Supp. 3d 1101 (N.D. Cal. 2026), *appeal docketed*, No. 26-2011 (9th Cir. Apr. 2, 2026) ............ 20, 25

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) ............ 31

*ASSE Int'l, Inc. v. Kerry*,
182 F. Supp. 3d 1059 (C.D. Cal. 2016) ............ 27

*Autor v. Pritzker*,
740 F.3d 176 (D.C. Cir. 2014) ............ 22, 33

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ............ 28

*Bridges v. Wixon*,
326 U.S. 135 (1945) ............ 34

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ............ 30

*California v. Bureau of Land Mgmt.*,
277 F. Supp. 3d 1106 (N.D. Cal. 2017) ............ 27

*Citizens United v. FEC*,
558 U.S. 310 (2010) ............ 29, 30, 31

*Counnty of Santa Clara v. Trump*,
250 F. Supp. 3d 497 (N.D. Cal. 2017) ............ 15, 34

*Ctr. for Biological Diversity v. Zinke*,
900 F.3d 1053 (9th Cir. 2018) ............ 20

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ............ 29

*Dickinson v. Zurko*,
527 U.S. 150 (1999) ............ 16

*Dole Food Co. v. Patrickson*,
538 U.S. 468 (2003) ....................................................................................................14

*Dynasty Int'l LLC v. Lexington Ins. Co.*,
2016 WL 3346073 (N.D. Ind. June 16, 2016) ...........................................................................16

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .................................................................................................. 11, 12

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ...........................................................................................15, 33, 34

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ....................................................................................................11

*FCC v. League of Women Voters of Cal.*,
468 U.S. 364 (1984) ....................................................................................................29

*FEC v. Cruz*,
596 U.S. 289 (2022) ....................................................................................................31

*Fikre v. FBI*,
35 F.4th 762 (9th Cir. 2021)......................................................................................24, 25

*First Nat'l Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978) ....................................................................................................30

*First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*,
462 U.S. 611 (1983) ....................................................................................................17

*FTC v. Super. Ct. Trial Laws. Ass'n*,
493 U.S. 411 (1990) ....................................................................................................28

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ....................................................................................................33

*Hall v. Dep't of Agric.*,
984 F.3d 825 (9th Cir. 2020)......................................................................................13, 14

*Hesai Tech. Co. v. Dep't of Def.*,
792 F. Supp. 3d 22 (D.D.C. 2025), *rev'd on other grounds and remanded by* 186 F.4th 873 (D.C. Cir. 2026) ....................................................................................................23

*Hesai Tech. Co. v. Dep't of Def.*,
186 F.4th 873 (D.C. Cir. 2026) .................................................................................23, 24, 25

*Hill v. Colorado*,
530 U.S. 703 (2000) ....................................................................................................15

*Hinds Invs., L.P. v. Angioli*,
654 F.3d 846 (9th Cir. 2011) .......... 23

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) .......... 31

*Humanitarian L. Project v. U.S. Dep't of Treasury*,
463 F. Supp. 2d 1049 (C.D. Cal. 2006), *modified on other grounds*, 484 F. Supp. 2d 1099 (C.D. Cal. 2007), *aff'd*, 578 F.3d 1133 (9th Cir. 2009) .......... 34

*James v. City of Costa Mesa*,
700 F.3d 394 (9th Cir. 2012) .......... 14

*Judulang v. Holder*,
565 U.S. 42 (2011) .......... 10, 11

*Lands Council v. Powell*,
395 F.3d 1019 (9th Cir. 2005) .......... 19

*Lanzetta v. New Jersey*,
306 U.S. 451 (1939) .......... 34

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) .......... 16

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 10

*McMullen v. Coakley*,
573 U.S. 464 (2014) .......... 30

*Meyer v. Grant*,
486 U.S. 414 (1988) .......... 29

*Miller v. California*,
355 F.3d 1172 (9th Cir. 2004) .......... 25

*Miller v. Ziegler*,
109 F.4th 1045 (8th Cir. 2024) .......... 28, 29, 33

*Montana Wildlife Fed'n v. Haaland*,
127 F.4th 1 (9th Cir. 2025) .......... 24, 26

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......... 32

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... *passim*

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011) .......... 19, 20

*Nat. Grocers v. Rollins*, 157 F.4th 1143 (9th Cir. 2025) .......... 27

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) .......... 28

*Ohio v. EPA*, 603 U.S. 279 (2024) .......... 10

*Old Colony Ins. Co. v. Jeffery's Mill & Warehouse, Inc.*, 146 F. Supp. 277 (N.D. Cal. 1956) .......... 18

*Organized Village of Kake v. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015) .......... 12

*Port of Seattle v. FERC*, 499 F.3d 1016 (9th Cir. 2007) .......... 19

*Preston Trucking Co. v. Carolina Cas. Ins. Co.*, 712 F. Supp. 1208 (W.D. Pa. 1989) .......... 16, 20

*Prison Legal News v. Ryan*, 39 F.4th 1121 (9th Cir. 2022) .......... 13

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .......... 29, 30, 31

*Riddell v. Scales*, 406 F.2d 210 (9th Cir. 1969) .......... 19

*Rise Economy v. Vought*, 823 F. Supp. 3d 1013 (N.D. Cal. 2026), *appeal docketed*, No. 26-3134 (9th Cir. May 15, 2026) .......... 10

*Safe Air for Everyone v. EPA*, 488 F.3d 1088 (9th Cir. 2007) .......... 15

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) .......... 17

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) .......... 15

*Skilling v. United States*, 561 U.S. 358 (2010) .......... 15

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .......... 31

*SZ DJI Tech. Co. v. Dep't of Def.*,
2025 WL 2761210 (D.D.C. Sep. 26, 2025), *rev'd in part on other grounds*, 187 F.4th 528 (D.C. Cir. 2026) .......... 22

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025) .......... 29

*Travelers Indem. Co. v. United States*,
543 F.2d 71 (9th Cir. 1976) .......... *passim*

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) .......... 30, 32

*United States v. Hansen*,
599 U.S. 762 (2023) .......... 33

*Van Buren v. United States*,
593 U.S. 374 (2021) .......... 15

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) .......... 32

*Williams v. Taylor*,
529 U.S. 362 (2000) .......... 17

*WuXi AppTec Co. v. Dep't of Def.*,
2026 WL 2279624 (D.D.C. Aug. 7, 2026) .......... 14, 15, 21, 27

**Constitution and Statutes**

U.S. Const. amend. V .......... 24

Pub. L. No. 116-283, § 1260H, 134 Stat. 3388 (2021) .......... *passim*

Pub. L. No. 118-31, § 805, 137 Stat. 136 (2023) .......... 4, 25

Pub. L. No. 118-47, § 536, 138 Stat. 460 (2024) .......... 25

Pub. L. No. 119-60, § 8531, 139 Stat. 718 (2025) .......... 4

Pub. L. No. 119-86, § 535, 140 Stat. 773 (2026) .......... 4

2 U.S.C. § 1602 .......... 4, 28, 29

5 U.S.C. § 704 .......... 11

5 U.S.C. § 706 .......... *passim*

10 U.S.C. § 113 ....................3
10 U.S.C. § 4663 .................... *passim*
42 U.S.C. § 18912 ....................4
42 U.S.C. § 19235 ....................4
Neb. Rev. Stat. § 49-1480....................31

**Advisory Opinion**

23 Op. O.L.C. 213 (1999)....................22

**Other Authorities**

Fed. R. Civ. P. 56 ....................10
170 Cong. Rec. H6639 (daily ed. Dec. 10, 2024).................... 31
H.R. 8800, 119th Cong. (2026) ....................4
86 Fed. Reg. 33994 (June 28, 2021)....................6
89 Fed. Reg. 22698 (Apr. 2, 2024)....................6
90 Fed. Reg. 1105 (Jan. 7, 2025)....................6
91 Fed. Reg. 35189 (June 10, 2026)....................9, 25
A. Scalia & B. Garner, *Reading Law* (2012) ....................13
*Association*, Oxford Eng. Dictionary (June 2026), https://shorturl.at/nq0Bd .................... 16
*Close*, Merriam-Webster, https://shorturl.at/Dqoqq (last visited Nov. 7, 2026) ....................16
*Contribute*, Merriam-Webster, https://shorturl.at/m4O5T (last visited Nov. 7, 2026) ....................23
*Contribute*, Oxford Eng. Dictionary (Sep. 2026), https://shorturl.at/dsLpK.................... 23

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Alibaba is an independent, publicly traded e-commerce and cloud-computing company. It makes no military products and holds no military-production licenses, and its contracts prohibit military use of its services. The Department of Defense has nonetheless branded Alibaba a "Chinese military company" ("CMC") under Section 1260H. The Department presented scant justification for this designation, citing: (1) Alibaba's non-controlling stake in a decade-old commercial venture, (2) a hundred-word online article about an aspirational agreement with a state-owned enterprise ("SOE"), and (3) a single employee's seat on a government-led standards committee. Moreover, the Department issued the designation without ever telling Alibaba what it was relying on or giving Alibaba an opportunity to respond before imposing the designation and its resultant consequences, including barring Alibaba from certain federal contracts, triggering 10 U.S.C. § 4663's restrictions on Alibaba's First Amendment rights, and damaging Alibaba's reputation.

The designation must be vacated, and Section 4663 must be declared unconstitutional.

*First*, the designation violates the Administrative Procedure Act in multiple ways. The Department never acknowledged, let alone explained why, it designated Alibaba in February 2026, withdrew the designation within an hour, and then designated it again a few months later on the same grounds. That failure alone requires vacatur. The Department's decision is also arbitrary and capricious on its own terms. The Department's first ground for designating Alibaba—that Alibaba is "indirectly affiliated with" the State-Owned Assets Supervision and Administration Commission ("SASAC"), the agency that oversees China's SOEs—rests on a misinterpretation of Section 1260H, which does not reach "indirect" affiliation. Even if the statute did cover indirect affiliation, designating Alibaba based on ordinary, arm's-length commercial dealings with two state-owned enterprises is arbitrary and capricious. The Department's second ground—that Alibaba is a "military-civil fusion contributor to the Chinese defense industrial base" because a single Alibaba employee sits on a standards committee led by the Ministry of Industry and Information Technology ("MIIT")—also fails. An employee holding a committee seat does not create a close association with the regulator that convenes the committee. Moreover, for both grounds, the Department failed

to observe the procedure required by Section 1260H, choosing to rely on outdated and unreliable sources rather than the most recent information available.

*Second*, the Department violated due process. Despite Alibaba's repeated requests for notice and an opportunity to respond, the Department deliberately withheld the basis for its decision and gave Alibaba no meaningful chance to rebut it. The D.C. Circuit has held that the Department may not impose the reputational harm and legal disabilities that come with designation without first disclosing the evidence it intends to rely on and allowing a response. Had the Department done so here, Alibaba would have submitted additional information that show the Department's sources are stale, incomplete, and wrong.

*Third*, Section 4663 violates the First Amendment. By barring the Department from contracting with any entity that retains a CMC's lobbyist, the statute forces every lobbying firm to choose between representing a CMC and keeping its clients that contract with the Department. As this Court recognized, the only rational choice is to drop the CMC, and every one of Alibaba's lobbyists did just that. The statute is, as the Court held, a speaker-based restriction on political speech and petitioning, and the government has not offered any evidence that the harms it imagines are real. The Court has already found Alibaba likely to succeed on its as-applied challenge. The record confirms that Section 4663 violates the First Amendment as applied to Alibaba and now also shows the statute has the same effect on other listed companies and their advocates, so it is facially overbroad as well.

*Fourth*, the designation must be set aside because Section 1260H is void for vagueness.

A CMC designation should rest on a correct interpretation of the statute and reasoned decisionmaking founded on adequate evidence, follow fair process, leave the labeled company free to petition the government, and arise from a statute that provides fair notice of the prohibited conduct. This one fails on all fronts.

## STATEMENT OF THE ISSUES

1. Whether the Department's designation of Alibaba as a Chinese military company was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or taken without observing procedure required by law. *See* 5 U.S.C. § 706(2)(A), (C)–(E).

2. Whether the Department violated the Fifth Amendment's due process clause by designating Alibaba as a Chinese military company without first providing notice of the allegations and a meaningful opportunity to respond. *See* 5 U.S.C. § 706(2)(B).
3. Whether 10 U.S.C. § 4663's lobbyist-contracting ban violates the First Amendment as applied to Alibaba or on its face.
4. Whether Section 1260H is void for vagueness as applied to Alibaba or, in the alternative, on its face.

## BACKGROUND

### A. Statutory Background

Section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 directs the Secretary of Defense to designate entities operating in the United States that meet certain statutory criteria as so-called "Chinese military compan[ies]." Pub. L. No. 116-283 § 1260H(a), 134 Stat. 3388, 3965 (2021) (codified as amended at 10 U.S.C. § 113 note). The Secretary must make those determinations "based on the most recent information available," notify the Armed Services Committees, and publish the list of designated entities in the Federal Register. *See* § 1260H(a)–(b).[1] The Secretary must also justify any additions or deletions compared to previously published lists. *See* § 1260H(b)(1).

The statute defines a CMC in two relevant ways. *First*, a CMC is an entity "directly or indirectly owned by, controlled by, or beneficially owned by, affiliated with, or in an official or unofficial capacity acting as an agent of or on behalf of" certain Chinese military, security, and industrial organs, including SASAC and MIIT. § 1260H(g)(2)(B)(i)(I). *Second*, a CMC is an entity "identified as a military-civil fusion contributor to the Chinese defense industrial base." § 1260H(g)(2)(B)(i)(II). A "military-civil fusion contributor," in turn, encompasses entities "affiliated with (including by means of formal participation in research partnerships and projects)" MIIT. § 1260H(g)(3)(B).

---

[1] Unless otherwise noted, all citations to Section 1260H refer to the amended version codified at 10 U.S.C. § 113 (note) and in force at the time of the designation.

Designation under Section 1260H carries legal consequences. The statute bars the Department from "enter[ing] into, renew[ing], or extend[ing] a contract for the procurement of goods, services, or technology with" a CMC. Pub. L. No. 118-31, § 805(a)(1)(A), 137 Stat. 136, 315 (2023) (codified at 10 U.S.C. § 4651 note prec.). A similar restriction cuts CMCs off from contracting with the Department of Homeland Security. *See* Pub. L. No. 119-86, § 535, 140 Stat. 773, 804 (2026). Designation also makes a CMC ineligible for certain Department of Energy funding and support. *See* 42 U.S.C. § 18912(a)(2)–(3), (c)(1)–(2); *id.* § 19235.

CMCs are also effectively barred by 10 U.S.C. § 4663 from retaining established advocates to lobby the government. Under the statute, the Department of Defense cannot "enter into a contract with an entity, a parent company of [a designated] entity, or a subsidiary of such entity [that] is a party to a contract with a covered lobbyist." 10 U.S.C. § 4663(a). The statute defines a "covered lobbyist" as "an entity that engages in lobbying activities for any entity determined to be a Chinese military company listed in accordance with section 1260H." *Id.* § 4663(d)(1). And "lobbying activities" include "any oral or written communication (including an electronic communication)" to designated government officials—as well as "preparation and planning activities, research and other background work that is intended" to assist such contacts—with regard to federal legislation, federal rules and regulations, executive orders, and nominations. 2 U.S.C. § 1602(7)–(8)(A); *see* 10 U.S.C. § 4663(d)(2) (incorporating definition through 10 U.S.C. § 971 note prec.).

The federal government is considering even further restrictions. As required by the National Defense Authorization Act for Fiscal Year 2026, the executive branch is presently assessing whether U.S. persons should be restricted from purchasing or selling listed entities' securities. *See* Pub. L. No. 119-60, § 8531, 139 Stat. 718, 1936–37 (2025). And Congress has proposed including additional procurement limitations, *see* H.R. 8800, § 1812, 119th Cong. (2026), lobbying restrictions, *see id.* § 1099L (security-clearance suspension or revocation for former Department employees and servicemembers who lobby on behalf of designees), and broader listing criteria in the National Defense Authorization Act for Fiscal Year 2027, *see id.* § 1244.

### B. Factual Background

Alibaba is a global e-commerce and cloud-computing company that provides products,

infrastructure, and services to consumers and businesses for civilian and commercial use. *See* AR0136.[2] Alibaba is an important partner of American businesses, helping American brands generate approximately $53.4 billion in sales through Alibaba's platforms in 2024, including more than $6.1 billion attributable to U.S. small businesses with fewer than one hundred employees. *See* AR0125, AR0127–28, AR0138; *see* Declaration of Eric C. Pelletier ISO Mot. for Summ. J. ¶ 5 & Ex. A (providing more recent data). Alibaba Cloud likewise provides commercial cloud-computing services to American companies operating in China and other international markets. *See* AR0139.

Alibaba is widely held by international shareholders and is independent from any government ownership or control. Alibaba Group is publicly traded on the New York and Hong Kong stock exchanges and subject to extensive disclosure, reporting, and audit requirements. *See* AR0219. It has a single class of ordinary shares, each carrying one vote, and a diverse international shareholder base. *See id.* Since early 2025, the only shareholders that at any point have held five percent or more of its stock are three American institutional investors: JPMorgan, Citigroup, and BlackRock. *See id.* No Chinese SOE controls Alibaba, and neither the Chinese government nor its military holds any special control rights in Alibaba. *See* AR 0218–20. The company is governed by a ten-member board whose members have diverse international backgrounds and no military affiliations. *See* AR0141, AR0219.

Alibaba's products and services are designed for civilian and commercial use. Alibaba does not manufacture military equipment, supply military products or services to the People's Liberation Army, conduct joint research with the Chinese military, or receive Chinese military-civil fusion funding. *See* AR0136, AR0147. Nor does it possess military-production licenses or defense certifications. *See id.* Alibaba maintains compliance controls designed to prevent military use, including daily screening against U.S. government restricted-party lists. *See* AR0142. Its standard cloud-computing contracts expressly prohibit use of its services "for military purposes or in connection with users or applications related to weapons of mass destruction." AR0143.

---

[2] The parties will submit a joint appendix incorporating all cited administrative record materials at least 28 days before the hearing date. *See* Dkt. 58.

The U.S. government has previously recognized Alibaba for its cooperation on cybersecurity and intellectual-property protection. A 2022 report from DHS's Cyber Security Review Board recognized that "[t]he global community benefited" from how an Alibaba Cloud researcher discovered and reported a critical security vulnerability in a popular Java-based computer program, allowing its developers to investigate and prepare a patch. *See* AR0180. DHS's National Intellectual Property Rights Coordination Center has similarly recognized that "Alibaba has consistently proven its leadership in [intellectual-property rights] protection many times over and is clearly committed to combatting illicit actors engaged in the trafficking of counterfeit and pirated goods." AR 0154.

**C. Procedural Background**

For years, the Department of Defense did not regard Alibaba as a CMC. *See* 86 Fed. Reg. 33994, 33994–95 (June 28, 2021); 89 Fed. Reg. 22698, 22698–99 (Apr. 2, 2024); 90 Fed. Reg. 1105, 1105–06 (Jan. 7, 2025). That apparently changed in 2025. On October 7, 2025, Deputy Secretary Feinberg informed Congress that "the Department ha[d] identified eight [additional] entities that it has determined are 'Chinese military companies' in accordance with the statute," including Alibaba, and that those entities "should be added to the 1260H List." AR 1781–84. The Department did not notify Alibaba of this decision, the basis for it, or that the decision had been shared with Congress. *See* Pelletier MSJ Decl. ¶ 9. Word of the determination surfaced only weeks later when the press reported on Deputy Secretary Feinberg's letter, *see* Dkt. 21-2, and then several committee and subcommittee chairs wrote to Secretary Hegseth applauding the reported decision, *see* Dkt. 21-3.

Alerted by these press reports, Alibaba promptly sought to be heard. On December 24, 2025, it wrote to the Department requesting a meeting and offering to answer any questions about its business and any alleged military affiliations. *See* AR0085–86. The parties met on January 21, 2026, and at that meeting, Alibaba explained why it is not a CMC. *See* Pelletier MSJ Decl. ¶ 10. Alibaba described its widely dispersed shareholder base and independent governance structure, its products and services, the absence of any defense-related business, and its compliance controls designed to prevent military use of its products and services. *See* AR0121–53. Alibaba further explained that it receives no funding related to the Chinese government's military-civil fusion policy. *See* AR0147.

The Department did not request any additional information or identify any concerns at the meeting or in response to Alibaba's follow-up correspondence and additional materials, which specifically requested "advance notice" and "an opportunity to respond" before any listing decision. AR0121; *see* AR0121–210; Pelletier MSJ Decl. ¶ 10. Unbeknownst to Alibaba, by the time of the January 2026 meeting, the Department had already prepared its decision memorandum or "profile report" on Alibaba. *See* AR1808. That memorandum, dated January 9, 2026 (although not shared with Alibaba until September 2026), concluded (1) that Alibaba was "indirectly affiliated with SASAC" based on its collaboration with China North Industries Group Corporation Limited ("Norinco") and China Mobile Communications Group Co., Ltd., and (2) that Alibaba was "a military-civil fusion contributor to the Chinese defense industrial base because it is affiliated with MIIT" through participation on an MIIT-led AI standardization committee. AR1812–16. On February 9, 2026, Deputy Secretary Feinberg approved listing Alibaba based on the decision memorandum, which did not address Alibaba's January 21 presentation or follow-up submissions. AR1786–89; *see* AR1808–25. The Department chose not to notify Alibaba or the other listed entities in advance to "minimiz[e] the risk that these entities will take measures to avoid procurement bans or to eliminate or destroy information related to their connection to the Chinese government." AR1787. Instead, on February 13, 2026, at about 8:45 a.m., a revised Section 1260H list that included Alibaba was posted for public inspection on the Federal Register website. *See* Dkt. 21 ¶ 7; Dkt. 21-4 at 2; *see also* AR1789–93. The list identified the statutory bases for designating Alibaba but did not disclose the factual allegations contained in the decision memorandum. Dkt. 21-4 at 3.

Less than an hour later, the Department reversed itself and asked the Federal Register to remove the list. *See* Dkt. 21-5; AR1834. The Department provided no public explanation for that withdrawal. Nor did it inform Alibaba why it was designated and then de-designated. The withdrawn list nevertheless caused Alibaba reputational harm and negatively affected investor sentiment. *See, e.g.*, Pelletier MSJ Decl. ¶ 39.

Alibaba asked the Department for the decision memorandum supporting the withdrawn designation so that it could respond to the Department's specific concerns. *See* AR0214–15. The Department did not provide it. It responded only that "[i]t came to the attention of the Department

that the 1260H list posted for public inspection on the Federal Register on February 13 may require updates based on the statutory requirement to review the most recent information available." AR0214. It did not identify what information had prompted the withdrawal, how that information came to its attention, which aspects of the list required updates, or what additional information it intended to review. *See* Pelletier MSJ Decl. ¶ 13.

On March 24, 2026, Alibaba made a detailed submission addressing the two statutory bases stated in the withdrawn list. *See* AR0216–24. Alibaba explained that its independent governance, its diverse shareholders, and the absence of governmental-control rights belied any "close formal or informal association" with SASAC, and that ordinary commercial relationships with state-owned enterprises do not establish such an association. AR0219–21. Alibaba further explained that its interactions with MIIT involved routine regulatory compliance and industry standard-setting activities common among American and other multinational technology companies—not institutional affiliation with the regulator. AR0221–23. Alibaba was not able to respond to the specific factual bases underpinning the Department's prior listing decision, which had not been made known to Alibaba, but Alibaba again requested "advance notice of any adverse determination" and "a meaningful opportunity to respond … before any final decision." AR0216, AR0224. The Department replied to the submission with one word: "Received." AR0225.

On June 5, 2026, Deputy Secretary Feinberg again approved the designation of Alibaba as a CMC based on the same two statutory grounds—that Alibaba was purportedly (1) "indirectly affiliated with SASAC" and (2) "a military-civil fusion contributor to the Chinese defense industrial base because it is affiliated with MIIT." AR0001–4, AR0007. According to a revised decision memorandum, dated May 13, 2026, the Department again predicated the first ground on Alibaba's alleged work with the same two state-owned entities. It specifically identified Alibaba's decade-old joint venture with Norinco—Qianxun Spatial Intelligence—that offers commercial location and positioning services using China's BeiDou satellite-navigation system, and a March 2025 agreement with China Mobile to cooperate on digital infrastructure and AI. *See* AR0059–63. The Department based its second ground on an Alibaba vice president's participation (with about forty others) on an AI standards committee led by MIIT. AR0064–65. The memorandum acknowledged Alibaba's

January 21 presentation and March 24 submission but cursorily dismissed them as "not compelling." AR0065. The Department posted the list for public inspection on June 8 and published it in the Federal Register two days later. *See* 91 Fed. Reg. 35189, 35189 (June 10, 2026).

As before, the designation harmed Alibaba. *See, e.g.*, Dkt. 21-9. Senior Members of Congress called on the Securities and Exchange Commission to suspend Alibaba from trading on the New York Stock Exchange, *see* Dkt. 38 ¶ 10, and urged American companies to stop doing business with Alibaba, *see, e.g.*, *id.*; Dkt. 21-10. Congress and the Executive branch started considering additional actions that would affect Alibaba. *See* Dkt. 38 ¶ 9. And as a result of Section 4663, Alibaba's lobbyists and lobbying firms terminated their representations of Alibaba, leaving the company without the experienced and knowledgeable advocates who had engaged on Alibaba's behalf with different parts of the federal government on a wide array of issues. Dkt. 22 ¶¶ 26–29.

Alibaba brought suit against the Department on June 23, 2026, challenging the designation under the APA and the Due Process Clause and challenging Section 4663 under the First Amendment. *See* Compl., Dkt. 1. Alibaba moved for a temporary restraining order and preliminary injunction on its First Amendment claim. On October 26, 2026, the Court granted a preliminary injunction. *See* Prelim. Inj. Order, Dkt. 51. The Court found that Alibaba was likely to succeed on its as-applied First Amendment challenge to Section 4663's lobbyist-contracting ban and had satisfied the other preliminary-injunction factors. *See id.* at 8–23. The Court enjoined the Department from enforcing Section 4663's prohibition as to Alibaba or refusing to contract with any entity based on its relationship with a lobbying firm that engages in lobbying activities for Alibaba. *Id.* at 26.

Meanwhile, the government produced the administrative record necessary for this Court's evaluation of the APA claims. The government initially provided an administrative record that lacked any materials supporting the October 2025 determination to designate Alibaba as a CMC, the February 2026 list published on the Federal Register website, or the sudden withdrawal of that decision less than an hour later. Alibaba notified the government that it viewed the administrative record as incomplete and requested that the government include materials related to those aspects of the government's decisionmaking process. The government subsequently "supplemented" the

administrative record, certifying that the combined original and supplemental record constitute a "complete copy of the documents that were directly or indirectly considered in connection with DoD's decision to identify Plaintiffs on the Section 1260H list." Dkt. 48-2 ¶¶ 8–9.

**LEGAL STANDARD**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that "might affect the outcome of the suit under the governing law," and a dispute is genuine when the evidence is such that a reasonable factfinder could find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

For claims seeking review of agency action under the APA, however, "the district court acts like an appellate court, and the entire case is a question of law." *Rise Economy v. Vought*, 823 F. Supp. 3d 1013, 1025 (N.D. Cal. 2026) (quoting *Gill v. Dep't of Just.*, 246 F. Supp. 3d 1264, 1268 (N.D. Cal. 2017)), *appeal docketed*, No. 26-3134 (9th Cir. May 15, 2026). The APA directs courts to "hold unlawful and set aside agency action" that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right"; "in excess of statutory jurisdiction, authority, or limitations"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority" and, "under the APA[,] may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024). The same is true for constitutional questions: the reviewing court "shall decide all relevant questions of law" and "interpret constitutional and statutory provisions." 5 U.S.C. § 706.

"An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In other words, it must engage in "reasoned decisionmaking." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). An agency has failed to do so "if the

agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

## ARGUMENT

### I. The Department Has Violated The Administrative Procedure Act.

The designation of Alibaba as a CMC is final agency action, 5 U.S.C. § 704, and unlawful under 5 U.S.C. § 706(2)(A) and (C)–(E) because: (1) the Department failed to acknowledge or explain its changing positions; (2) it wrongly interpreted Section 1260H(g)(2)(B)(i)(I); (3) its conclusion that Alibaba is "affiliated with" SASAC is arbitrary and capricious and unsupported by the record; and (4) its finding that Alibaba is a military-civil fusion contributor to the Chinese defense industrial base is arbitrary and capricious and unsupported by the record. The designation should be vacated.

#### A. The Department failed to provide an adequate explanation for its decision.

The Department has changed its mind about whether Alibaba belongs on the Section 1260H List more than once. In October 2025, the Department told Congress that Alibaba was a CMC that "should be added to the 1260H List." AR1781–84. In February 2026, it designated Alibaba, *see* AR1786–93, and then quickly withdrew the list containing Alibaba without explanation, *see* AR1834. And in June 2026, it designated Alibaba again, on the same stated grounds as before, without a word about what had transpired previously. *See* AR0001–07; AR0055–84. The Department has never explained that back-and-forth, and in making the June designation, it did not even acknowledge it. That failure alone renders the designation arbitrary and capricious.

Under the APA, an agency must "give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Without them, a court cannot tell "whether [an agency] decision was based on a consideration of the relevant factors" and "relevant data" or "whether there has been a clear error of judgment." *State Farm*, 463 U.S. at 43. That obligation is especially important when an agency changes course. The agency must at least "display awareness that it is changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). It must

provide "good reasons for the new policy." *Id.* And if that "new policy rests upon factual findings that contradict those which underlay its prior policy, [it] must include a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Organized Village of Kake v. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (cleaned up). An "unexplained inconsistency" in an agency position is reason enough to set the action aside. *Encino Motorcars*, 579 U.S. at 222 (cleaned up).

The Department's June 2026 designation of Alibaba fails at the first step. It showed no awareness that, four months earlier, the Department had designated Alibaba on the same two grounds and then withdrawn that designation. *See* AR1786–93; AR1812; AR1834. Neither Deputy Secretary Feinberg's June 2026 approval memorandum nor the May 2026 decision memorandum even mentions the February 2026 designation or its withdrawal. *See* AR0001–07; AR0055–84. The June 2026 approval memorandum says that "the most recent 1260H List" was the one published in January 2025 (which did not include Alibaba). AR0002–03. But that description is impossible to square with the publication of the February 2026 list and with what the Department told Alibaba two weeks after the withdrawal of that list. When Alibaba asked for the decision memorandum behind the withdrawn list, the Department responded: "It came to the attention of the Department that the 1260H list posted for public inspection on the Federal Register on February 13 *may require updates* based on the statutory requirement to review the most recent information available." AR0214 (emphasis added). So the Department knew the February list existed, and it told Alibaba that the list might need updating. Yet it has never said what came to its attention, what the review revealed, or why that review led back to Alibaba being listed. And until Alibaba objected, the Department left the October 2025 and February 2026 materials out of the administrative record altogether. *Compare* Dkt. 35-1, *with* Dkt. 48-1; *see* AR1781–1834.

To be sure, the APA allows an agency to reconsider its position but does not allow the agency to pretend that nothing happened. The Department's June decision neither acknowledges that the Department withdrew Alibaba's designation in February and then reinstated it on the same grounds, nor explains why it did so. The designation should be vacated for that reason alone.

**B. The Department's indirect-affiliation theory is contrary to law and in excess of statutory jurisdiction.**

The Department's first ground for designating Alibaba is that the company is "indirectly affiliated, i.e., in close formal or informal association, with SASAC … through collaboration with state-owned enterprises (SOEs) owned by SASAC." AR0059 (citing § 1260H(g)(2)(B)(i)(I)). But Congress did not make indirect affiliation a basis for designation. Because the Department measured Alibaba against a standard Congress did not enact, that ground must be set aside.

Section 1260H defines a "Chinese military company" to include "an entity that is—(i)(I) directly or indirectly owned by, controlled by, or beneficially owned by, affiliated with, or in an official or unofficial capacity acting as an agent of or on behalf of" SASAC, among other Chinese state organs. § 1260H(g)(2)(B)(i)(I). The government reads the phrase "directly or indirectly" to modify all of the terms in this provision, including "affiliated with." But basic rules of grammar and statutory interpretation make clear that "directly or indirectly" modifies only the list of three ownership-and-control terms that come immediately after that phrase. The statute does not provide for designation based on "indirect" affiliation with SASAC.

This conclusion is clear from a straightforward reading of the statutory language. The phrase "directly or indirectly" is most naturally read to modify only "owned by, controlled by, or beneficially owned by." If Congress meant "directly or indirectly" also to modify "affiliated with," it would have placed the word "or" *after* "beneficially owned by."

Canons of statutory construction support this natural reading of the statute's terms. Under the nearest-reasonable-referent canon, "[w]hen the syntax involves something other than a parallel series of nouns or verbs, a prepositive or postpositive modifier normally applies only to the nearest reasonable referent." A. Scalia & B. Garner, *Reading Law* 152 (2012); *see Prison Legal News v. Ryan*, 39 F.4th 1121, 1131 (9th Cir. 2022) (applying canon); *Hall v. Dep't of Agric.*, 984 F.3d 825, 838 (9th Cir. 2020) (same). Section 1260H(g)(2)(B)(i)(I)'s syntax is not a parallel series of terms that are all on equal footing. Instead, it is a list within a list. The first three terms form their own complete, self-contained list: "owned by, controlled by, or beneficially owned by." The "or" before "beneficially owned" marks the extent of that initial list. That set of three terms then serves as the

first item in the overall list: (1) "directly or indirectly owned by, controlled by, or beneficially owned by"; (2) "affiliated with"; or (3) "acting as an agent of or on behalf of." Because "directly or indirectly" sits at the head of the initial list of three terms, that list is its nearest reasonable referent. So, "[a]s a grammatical matter, 'directly or indirectly' most naturally modifies only the first cluster of ownership and control terms," not the phrase "affiliated with." *WuXi AppTec Co. v. Dep't of Def.*, 2026 WL 2279624, at *8 (D.D.C. Aug. 7, 2026).

Other "indicia of meaning" confirm this reading rather than "overcome" it. *Hall*, 984 F.3d at 838. Start with how the words read together. It makes little sense to say that an entity "indirectly" "acts as an agent of" another person. *See WuXi*, 2026 WL 2279624, at *8. And it makes no sense at all to say that an entity is "indirectly" in "close … association" with another. § 1260H(g)(1) (defining "affiliated with"). An association that runs through a third party is not a close one. Courts avoid readings that produce that kind of "semantic dissonance." *James v. City of Costa Mesa*, 700 F.3d 394, 399 (9th Cir. 2012). By contrast, ownership and control are routinely exercised through intermediaries, so "directly or indirectly" fits with those terms naturally. Congress, in fact, regularly pairs "indirectly" with "ownership" when it seeks to capture a broader sense of ownership than traditional corporate law recognizes. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 476 (2003) (collecting examples). When Congress leaves the word out, though, courts do not supply it. *See id.* at 474–77 (holding that a statute covering entities whose shares are "owned by" a foreign state does not reach entities the state owns only indirectly). The Department's theory would nevertheless require this Court to do just that.

The consequences of that interpretation would not stop with Alibaba. If the Department is correct that a CMC includes any company that signs a "cooperation agreement" or "strategic agreement" with a SASAC-owned SOE, AR0060, AR0062, and that each such agreement is "an independent ground" for designation, *id.*, that would sweep in some of America's best-known companies (or at least their Chinese subsidiaries). Apple, for instance, has long-running commercial arrangements with China Mobile and China Telecom—SOEs on the Section 1260H List—to distribute iPhones and offer related services to mobile device users. *See* Declaration of Christopher A. Eiswerth ISO Mot. for Summ. J., Exs. A–B. Boeing has partnered with Commercial Aircraft

Corp. of China, another listed SOE, on research. *See id.*, Ex. C. General Motors has maintained a joint venture with the state-owned SAIC Motor since 1997, and it recently extended that venture for another 20 years. *See id.*, Ex. D. Under the Department's reading, each of these companies, or at least their Chinese subsidiaries, would be a candidate for the 1260H List. *Cf. WuXi*, 2026 WL 2279624, at *9 (questioning a reading that "would make a member of the Big Ten a Chinese military company"). Nothing suggests that Congress meant to give Section 1260H that kind of reach. *Cf. Van Buren v. United States*, 593 U.S. 374, 393–94 (2021) (rejecting interpretation as implausible because of the vast range of ordinary conduct it would sweep in).

A reading that adopts the government's seemingly limitless interpretation would raise serious vagueness concerns. *See* Part IV, *infra*. A law is impermissibly vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (applying fair-notice requirement to civil regulation). On the Department's reading, Section 1260H would present both problems because there would be no "clear standards" to guide enforcement. *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 535 (N.D. Cal. 2017). The statute should be construed to avoid such a problem. *See Skilling v. United States*, 561 U.S. 358, 405–09 (2010).

In short, the phrase "directly or indirectly" modifies the ownership-and-control terms—not "affiliated with." By reading the statute otherwise, the Department applied the wrong legal standard and treated Alibaba's commercial arrangements with SASAC-owned companies as per se sufficient to establish an affiliation with SASAC itself. *See* AR0060, AR0062. That legal error, by itself, requires the Court to set aside the Department's SASAC ground for designating Alibaba. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50. But "an order may not stand if the agency has misconceived the law." *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943); *see Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007) (setting aside action justified on "legally erroneous" basis and remanding for further consideration). Because the Department's other ground, that Alibaba is a military-civil fusion contributor, fails as well, *see* Part. I.D, *infra*, the designation must be vacated.

### C. The Department's SASAC finding is arbitrary and capricious.

The SASAC ground fails for a second, independent reason. The record does not show the requisite relationship between Alibaba and SASAC under the correct statutory interpretation or the government's erroneous reading.

#### 1. The record does not show a close association between Alibaba and SASAC.

To designate Alibaba under Section 1260H(g)(2)(B)(i)(I), the Department must find that the company is "affiliated," meaning "in close formal or informal association," with SASAC. § 1260H(g)(1). But the record does not include a single direct tie between Alibaba and SASAC, let alone show the kind of intimate connection necessary for an "affiliation" or even "association."

An agency acts arbitrarily and capriciously when it fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43. Under that standard, review of agency factfinding is equivalent to substantial-evidence review. *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 759 (9th Cir. 2014). A court must assess "whether a reasonable mind might accept a particular evidentiary record as adequate to support a conclusion." *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999) (cleaned up). Here, the Department's conclusion must be "based on the most recent information available." § 1260H(a).

The SASAC finding cannot meet that standard. "Association" in ordinary terms is "the state or condition of being united or allied with others … for a common purpose or mutual benefit." *Association*, Oxford Eng. Dictionary (June 2026), https://shorturl.at/nq0Bd. In law, "association" conveys "an intimate business relationship in which significant aspects of financial and managerial control … are integrated." *Travelers Indem. Co. v. United States*, 543 F.2d 71, 76 (9th Cir. 1976); *see id.* at 76 & n.5 (collecting cases); *Dynasty Int'l LLC v. Lexington Ins. Co.*, 2016 WL 3346073, at *4 (N.D. Ind. June 16, 2016) (adopting similar interpretation); *Preston Trucking Co. v. Carolina Cas. Ins. Co.*, 712 F. Supp. 1208, 1212 (W.D. Pa. 1989) (same). A "close" association would be a particularly "near" or "intimate" one. *Close*, Merriam-Webster, https://shorturl.at/Dqoqq (last visited Nov. 7, 2026). And that interpretation would be consistent with the ordinary definition of

"affiliate": "a company effectively controlled by another or associated with others under common ownership or control." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (quoting Webster's Third New Int'l Dictionary 25 (2002)). The Department's own description of SASAC shows what such a relationship looks like. The SOEs are "legally recognized as corporate entities rather than government entities." AR1175. But SASAC, through a variety of ways, manages them on behalf of the government. *Id.* It selects their top executives, sets their compensation, evaluates their performance, and audits them. *See* AR0061–62; AR1176; AR1184-85. At bottom, SASAC ensures that the SOEs maximize gains for the state and "translat[e] government policy into corporate governance." AR1175; *see* AR1183–87.

None of that is true when it comes to Alibaba. The company's stock is publicly traded on the New York and Hong Kong exchanges, and its shareholder base is widely dispersed. *See* AR0140. A ten-member board governs, and no director is a member of the Chinese government or the Chinese Communist Party. AR0141. The Chinese government holds no golden share or special control right in Alibaba. *Id.* And SASAC exercises no regulatory authority over Alibaba. AR0219.

The Department did not find otherwise. It identified no direct link between Alibaba and SASAC—no ownership, no control, no board-appointment right, and no direct dealings between them. *See* AR0059–63. What the Department identified instead were relationships with two companies that SASAC owns or controls. *See* AR0060 (Norinco); AR0062 (China Mobile). But that is plainly not a sufficient relationship between SASAC and Alibaba under the statute. Indeed, "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 626–27 (1983). To treat a commercial counterparty of an SOE as joined together with its major shareholder ignores that principle and, at a minimum, would read "close" out of the definition of "affiliated with." *See Williams v. Taylor*, 529 U.S. 362, 404 (2000).

**2. The record does not show a close association between Alibaba and the identified SOEs.**

Even under the government's view that a close association with a SASAC-owned company makes an entity "indirectly affiliated with" SASAC, the Department's finding here lacks substantial

evidence. The record identifies two commercial arrangements: Alibaba's investment, alongside Norinco, in Qianxun SI, and a reported strategic agreement with another SOE, China Mobile. *See* AR0060–63. The Department's description of these arrangements is significantly flawed, *see* Part II, *infra*, but even the existing record shows, at most, that each is an ordinary commercial relationship in which Alibaba pursued its "independent and separate objectives" and nothing more. *Travelers*, 543 F.2d at 76. That is not the integrated business arrangement that an association requires. *Cf. Old Colony Ins. Co. v. Jeffery's Mill & Warehouse, Inc.*, 146 F. Supp. 277, 279–80 (N.D. Cal. 1956) (finding association only after weighing 16 factors). The Department did not explain otherwise; it simply labeled each relationship a "close formal association." AR0060; AR0062–63. But a label is not a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. This ground should accordingly be set aside even under the government's own erroneous test.

***Norinco and Qianxun SI.*** A non-controlling stake in a single venture, formed more than a decade ago alongside an SOE, is not a close association with that SOE, and the record does not show otherwise. The Department relied on a reported 2015 cooperation agreement between Norinco and Alibaba to promote the commercial, non-military use of BeiDou, China's analogue to GPS, and Alibaba's subsequent ownership stake in Qianxun SI. In the Department's view, these actions established a close association with Norinco and, because BeiDou itself has some military application (separate from Qianxun SI), supported designation. AR0059–62. The Department did not purport to review the agreement or cite to any credible recent analysis of the collaboration. The record contains only a handful of short articles, most of them six or more years old and of questionable reliability. *See* AR0060–61 nn.21–33; AR1125–34; AR1144–58. Even crediting them, the Department's conclusion is not supported by substantial evidence.

The relationship that the Department describes runs through Qianxun SI, not between Alibaba and Norinco in any meaningful way. The cooperation agreement was the vehicle for founding the venture. *See* AR0060 ("As part of the agreement, Alibaba and Norinco … jointly founded Qianxun [SI]."). "At the time of the deal, Alibaba held a 41.96% ownership stake," *id.*, and "agreed to pair its cloud computing service" with BeiDou, AR0060–61. All of that connects Alibaba

with Qianxun SI—not with Norinco. Nothing in the record establishes that Norinco owns or controls Alibaba, that its officers sit on Alibaba's board, or even that there are other dealings between Alibaba and Norinco. The Department's own sources describe how each company brought its own assets to the venture: Alibaba had its "advantage of software," and Norinco had BeiDou's "advanced terminal hardware systems." AR0060; *see also* AR1128; AR1142; AR1157. Two companies that invest in the same venture are, at most, each associated with that venture—not each other. *Cf. Riddell v. Scales*, 406 F.2d 210, 213 (9th Cir. 1969) ("The present taxpayers did not become real estate dealers solely because they were associated in a joint venture with a real estate dealer."). And it certainly does not make Alibaba closely associated with SASAC, which sits two steps further removed.

Nor does the record show what the relationship looks like today. Section 1260H requires the Department to act on "the most recent information available." § 1260H(a). It did not do so here. *See* 5 U.S.C. § 706(2)(A), (D). The Department's open-source records do not purport to describe the current inner workings of Qianxun SI. Instead, the Department has relied predominantly on a 2020 article from a defunct website, AR1125–31; quotations from a "naval expert" in a 2019 *Global Times* article, AR1142–43; and other predictive statements from 2015, AR1151–58. Then, it presumed little changed. AR0060. Reliance on such "outdated" and "stale" data is suspect, and here, the sources are insufficient to "carry the weight assigned to [them]." *Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir. 2005); *see N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085–87 (9th Cir. 2011) (rejecting reliance on stale data).

Nor can the Department fill that gap by pointing to BeiDou's military uses. *See* AR0060–62. Whether BeiDou has military applications says nothing about whether Alibaba is closely associated with Norinco. The Department's own sources describe Qianxun SI as a civilian enterprise. Its mission is to "promote civil and commercial use of the BeiDou system." AR 1128. Its "[t]ypical use cases" are civilian in nature and include "[p]recision agriculture," "[a]utonomous driving and intelligent transportation systems," "[s]urveying," and "[c]ustomer applications such as IoT, location-based services, and smartphone navigation." AR1132; *see* AR1127 (identifying other commercial uses). The Department's only contrary evidence about the venture itself is a 2019

*Global Times* article predicting that Qianxun SI would "promote military technology and civilian economic development." AR0060; AR1142. Relying on that article without accounting for the rest of the record was unreasonable. *See Port of Seattle v. FERC*, 499 F.3d 1016, 1035 (9th Cir. 2007); *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1069 (9th Cir. 2018). Indeed, the Department's sources compare Qianxun SI to Garmin. AR1145–46. Garmin builds its products on GPS, which the U.S. military operates. No one would say that alone makes Garmin closely associated with the Pentagon. Alibaba's stake in a company that builds civilian services based on BeiDou does not make it closely associated with Norinco, let alone with SASAC.

***China Mobile.*** The Department's second effort to connect SASAC and Alibaba fares no better. A single announced agreement to cooperate with an SOE is not a close association with that SOE, and the record does not show otherwise.

The Department found that Alibaba was indirectly affiliated with SASAC based on an alleged March 2025 "strategic agreement" between Alibaba and China Mobile "to carry out in-depth cooperation in digital infrastructure, application ecology, innovation capabilities, and international business" and to "jointly build and operate an AI data center." AR0062; *see* AR1298–99. The Department did not purport to review the agreement. Its sole source is an article of one-hundred-odd words from AAStocks.com, a site that warns readers that reliance on it "is at your sole risk" and that "do[es] not guarantee its accuracy." AR1300. The Department never explained why that article was reliable. *See N. Plains Res. Council*, 668 F.3d at 1075. And the article says nothing about the agreement's terms, any investment, any governance rights, or whether the parties have done anything pursuant to the agreement. *See* AR1298–99. For good reason, as explained below: the "agreement" is merely aspirational. *See* Part II, *infra*.

But even taking the record at face value, the agreement as described in the article leaves each party pursuing its "independent and separate objectives." *Travelers*, 543 F.2d at 76. Contractual cooperation, shared facilities, and common interests do not add up to "an intimate business relationship." *Id.*; *accord id.* at 76 n.5; *Preston*, 712 F. Supp. at 1212 ("an arms length contractual relationship … does not constitute an association or affiliation"). Nothing else in the record suggests any link between Alibaba and China Mobile, and the Department articulated no

other rational connection between the two, let alone between Alibaba and SASAC. *See State Farm*, 463 U.S. at 43; *Anthropic PBC v. Dep't of War*, 825 F. Supp. 3d 1101, 1132–33 (N.D. Cal. 2026) (If "there is a 'disconnect between the decision made and the explanation given,' an agency has not provided a reasoned explanation."), *appeal docketed*, No. 26-2011 (9th Cir. Apr. 2, 2026). Accepting that a bare commercial relationship with an SOE like China Mobile is sufficient for designation would prove too much. It would mean that Apple and other American firms could be deemed Chinese military companies. *See* pp. 14–15, *supra*; *WuXi*, 2026 WL 2279624, at *9. Neither logic nor the record supports such a finding. The SASAC ground should be set aside.

**D. The Department's military-civil fusion contributor finding is arbitrary and capricious.**

The Department's alternative ground suffers from similar defects. To designate Alibaba under Section 1260H(g)(2)(B)(i)(II), the Department must find that Alibaba is "a military-civil fusion contributor to the Chinese defense industrial base." As relevant here, a military-civil fusion contributor includes an entity "affiliated with" MIIT, "including by means of formal participation in research partnerships and projects." § 1260H(g)(3)(B). The Department found both that Alibaba is affiliated with MIIT and that it contributes to the Chinese defense industrial base. AR0064–65. The record supports neither finding.

***Alibaba is not affiliated with MIIT.*** MIIT is one of the principal regulators of China's technology sector. AR0221. It oversees the internet, telecommunications, and related industries, *id.*, and by the Department's own account, it "formulates and manages the development of sector-specific standards for 19 industries," AR0065. Companies in those industries, Alibaba included, deal with MIIT the way that companies everywhere deal with their regulators: they engage to ensure compliance with generally applicable requirements and, at times, to offer private industry's views on technical standards. AR0221–22. The Department found that Alibaba is affiliated with MIIT because one of its vice presidents serves on MIIT's AI standardization technology committee

alongside about 40 other academics and industry leaders. AR0065; *see* AR1433–37.[3] But a company's participation on industry-wide standards committee—let alone, an employee's or officer's participation in their individual capacity—does not establish a close association with the entity that convenes the committee.

Nothing in the record shows that this committee seat gives MIIT any hold over Alibaba. As with Norinco and China Mobile, the Department has not identified any ownership, control, board seats, or financial ties between Alibaba and MIIT. *See* AR0064–65; Part I.C, *supra*. Nor does the record suggest that the Alibaba vice president serving on the committee pursues Alibaba's interests, much less MIIT's. The record does not even show what the committee does in practice. It includes reports that MIIT announced the committee in December 2024, AR1418–21; AR1433–37; that the committee is responsible for "the formulation and revision of industry standards"—notably, not *military* standards—for AI, AR1433; and that, as of October 2025, the committee remained active, AR1464–67. Those materials neither say anything about what Alibaba's employee has done on the committee nor allege that the committee is developing military standards, which are entirely separate under Chinese law from the general-purpose civil technical standards dealt with by this committee. Nor did the Department find that the committee was a "research partnership[] [or] project[.]" § 1260H(g)(3)(B). A seat by an employee of Alibaba on the committee, with nothing more, therefore cannot support the Department's finding that Alibaba is closely associated, and thus affiliated, with MIIT.

Treating mere committee membership as enough to establish affiliation between Alibaba and the agency would also turn ordinary practice on its head. Governments routinely invite industry onto advisory and standard-setting bodies to get outside perspectives. For example, Congress

---

[3] The Decision Memorandum notes that Alibaba acknowledged receiving a Trusted Cloud Service Certification and participating in an industry alliance with a connection to MIIT. AR0064–65. But the Department does not appear to base its finding that Alibaba is a military-civil fusion contributor on those acknowledgments, and it provides no explanation for how receiving a certification or participating in an industry group constitutes a close association with the government agency. Defining "affiliated with" to include such arms-length interactions would itself be contrary to law, in excess of jurisdiction, and arbitrary and capricious. *See* Parts I.B and I.C, *supra.*

created the Industry Trade Advisory Committees to obtain advice from "representative elements of the private sector." *Autor v. Pritzker*, 740 F.3d 176, 178 (D.C. Cir. 2014) (quoting 19 U.S.C. § 2155(a)(1)). And the Office of Legal Counsel has recognized that representative members of advisory committees "owe their loyalty to outside interests," such that characterizing them as "Federal functionar[ies] is a contradiction in terms." 23 Op. O.L.C. 213, 214–15 (1999). No one would say that an American company whose executive sits on a trade advisory committee is closely associated with the Department of Commerce. Yet that is the logic of the Department's finding. Another court has rejected a similar move. *See SZ DJI Tech. Co. v. Dep't of Def.*, 2025 WL 2761210, at *13 (D.D.C. Sept. 26, 2025) (holding that a "single instance of cooperation with MIIT" on drafting a national standard "is insufficient to show the type of 'close relationship' needed to conclude that DJI is 'affiliated with' MIIT."), *rev'd in part on other grounds*, 187 F.4th 528 (D.C. Cir. 2026). This Court should too.

***No contribution to the Chinese defense industrial base.*** The Department has also never shown that Alibaba contributes to the Chinese defense industrial base. *See* § 1260H(g)(2)(B)(i)(II). Its analysis asked only whether Alibaba's cloud-computing and AI products and services have "significant military application." AR0064. But once more, it used the wrong benchmark.

"Contribute" means "to give or supply," *Contribute*, Merriam-Webster (last visited Nov. 7, 2026), https://shorturl.at/m4O5T, or to "provide (something other than money) to a larger or common resource," *Contribute*, Oxford Eng. Dictionary (Sept. 2026), https://shorturl.at/dsLpK. It requires the entity to take an "active role." *Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 851 (9th Cir. 2011). Congress did not define "Chinese defense industrial base" in Section 1260H, but "today Congress, the executive branch, think tanks, and media outlets frequently employ the term ['defense industrial base'] to refer to the organizations, facilities, and resources that supply the U.S. government … with materials, products, and services for defense purposes." Luke A. Nicastro, Cong. Rsch. Serv., R47751, *The U.S. Defense Industrial Base: Background and Issues for Congress* 1 (2024). Under the statute's ordinary meaning, then, the Department had to find that Alibaba actually supplies products or services for China's defense purposes, not just that its technology could have military application.

The Department never made that finding. It rested on its determination that Alibaba's products, as a category, "can be used by the PLA." AR0064. But merely producing a so-called dual-use product is not enough, *see Hesai Tech. Co. v. Dep't of Def.*, 792 F. Supp. 3d 22, 40 (D.D.C. 2025), *rev'd on other grounds and remanded by* 186 F.4th 873 (D.C. Cir. 2026), and the Department's record would not even support a finding that any Alibaba product "has substantial military application," *id.* at 41. The Department has not shown, for example, that Alibaba's cloud-computing platform or AI models are military grade. *Cf.* AR1340; AR1360–63. The unrebutted evidence in the record shows the opposite—that Alibaba holds no military production licenses and supplies nothing for China's defense purposes. *See, e.g.*, AR0136–37, AR0142–44, AR0147. In fact, Alibaba builds no products for military use or for integration into weapons systems, and it bars "military uses and users" through screening, monitoring, and contract terms. AR0136–37, AR0142–44, AR0147. As a result, no Alibaba product has substantial military application. The Department's contribution analysis does not even mention any of this information. *See* AR0064. That is a failure to "consider an important aspect of the program," which is itself an additional reason to set aside the military-civil fusion contributor finding.

* * *

Because both grounds for designating Alibaba cannot withstand scrutiny, the designation should be vacated—"the default remedy under the APA," *Montana Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025).

## II. The Department Has Violated Due Process.

The Department branded Alibaba as a CMC, imposed federal-contracting bars, and cut it off from its long-time advocates without first telling the company why or giving it a chance to respond to the government's concerns. That was not an oversight. In June, as in February, the Department deliberately withheld notice from every listed entity to keep them from "tak[ing] measures to avoid procurement bans." AR0002; AR1787. It did so despite Alibaba's repeated requests for advance notice and an opportunity to respond. *See* AR0121; AR0154; AR0224. As the D.C. Circuit recently held, the Department cannot, consistent with due process, impose this kind of stigma and legal

disability on a company without first disclosing the materials on which it intends to rely and giving the company a chance to respond. *See Hesai Tech. Co. v. Dep't of Def.*, 186 F.4th 873, 879 (D.C. Cir. 2026). The Department did neither here, and the designation must be vacated.

**A. The Department did not provide notice or an opportunity to be heard.**

The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. A procedural-due-process claim has three elements: "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; and (3) lack of process." *Fikre v. FBI*, 35 F.4th 762, 776 (9th Cir. 2021) (cleaned up). Under the "stigma-plus" doctrine, a plaintiff has "a cognizable liberty interest" when it "suffers stigma from governmental action plus alteration or extinguishment of a right or status previously recognized by [the] law." *Id.* (cleaned up). A plaintiff's legal status changes when it "legally [cannot] do something that [it] could otherwise do." *Miller v. California*, 355 F.3d 1172, 1179 (9th Cir. 2004)

Alibaba meets each element here. First the Department branded Alibaba a CMC in the Federal Register, *see* 91 Fed. Reg. at 35189, a charge Alibaba disputes, with immediate reputational consequences, *see Hesai*, 186 F.4th at 878 (recognizing that a designation "can be a blow to a company's reputation"); p. 7, *supra*. Second, the designation precludes Alibaba from contracting with the Department or DHS, *see* Pub. L. No. 118-31, § 805(a)(1)(A); Pub. L. No. 118-47, § 536, 138 Stat. 460, 622 (2024), and it effectively bars Alibaba from retaining any lobbyist who does business with the Department, contrary to the First Amendment, *see* 10 U.S.C. § 4663; Part III, *infra*. The Department thus deprived Alibaba "of a legal right it would otherwise enjoy: Federal law makes listed companies automatically ineligible for certain government contracts and forms of financial assistance." *Hesai*, 186 F.4th at 878; *see, e.g.*, *Anthropic*, 825 F. Supp. 3d at 1126 ("Debarring a corporation from government contract bidding constitutes a deprivation of liberty." (cleaned up)). Third, the Department imposed these consequences without notice of the basis for the designation or an opportunity to contest it beforehand. *See Hesai*, 186 F.4th at 877–81. And it cannot justify forgoing pre-deprivation notice when it waited eight months, from October 2025 to June 2026, between deciding to list Alibaba and actually doing so. *See id.* at 880–81; AR1781–84;

AR0001–04.

**B. The Department's error was not harmless.**

The lack of pre-deprivation process was not harmless. Alibaba tried to respond, but without notice of the Department's actual concerns, it had to guess. *See* Pelletier MSJ Decl. ¶ 14. Had Alibaba known that the Department was focused on Norinco and Qianxun SI and intended to rely on a record drawn largely from outdated, second-hand reporting, *see* AR0060-63, Alibaba could have shown, among other things, that Alibaba does not control Qianxun SI's board of directors or participate in its day-to-day decision-making; that Qianxun SI represents 0.1% of the total book value of Alibaba's investments; and that it is not considered part of the Alibaba Group. *See* Pelletier MSJ Decl. ¶¶ 20–23. Alibaba could also have shown that Qianxun SI does not hold military or defense-industry qualifications, that it is a one-off arrangement with a Norinco entity, and that Norinco has no ownership stake in or right to control Alibaba through Qianxun SI or otherwise. *See id.* ¶¶ 21–24.

Had Alibaba known that the Department was focused on the alleged "strategic agreement" between Alibaba and China Mobile, Alibaba could have explained, among other things, that the brief article—the 100 or so words on which the Department pinned its entire finding—is inaccurate in multiple respects. To start, the 2025 agreement between Alibaba (China) Co., Ltd. and China Mobile was aspirational in nature and merely created a framework for future cooperation; it did not guarantee any project would materialize. *See* Pelletier MSJ Decl. ¶¶ 25–26. In fact, there are no technology-sharing agreements, joint papers, or shared patents as a result of this agreement. *See id.* ¶ 27. The companies' AI models are competing products, and no jointly-built or -operated AI data center exists. *See id.* ¶ 28. In Alibaba's normal course of business, an Alibaba entity sells GPU servers and network cards to third-party customers, some of which are then sold and delivered directly or through other parties to China Mobile and other end customers. *See id.* ¶ 28–30. But these ordinary business dealings do not—and could not—create a close association between Alibaba and SASAC or China Mobile.

Had Alibaba known that the Department was focused on an Alibaba Cloud vice president's service on the MIIT-led AI standardization technology committee, Alibaba could have clarified that

the company itself is not a member and that the employee, like all committee members, provides only professional consultation. *See id.* ¶ 31 & Ex. B at art. 5, 9, 11. The committee's charter makes clear that its responsibilities are civilian in nature and that the employee's participation does not give MIIT any control over Alibaba. *Id.*, Ex. B at art. 2, 5. Indeed, committee membership is ultimately personal. *See id.* at art. 10 (describing individual qualifications), 12(4) (contemplating service following job change).

Because the Department failed to provide notice or an opportunity to be heard, Alibaba was unable to present this information and "to respond to the unclassified evidence the Secretary intended to rely upon and tailor its arguments accordingly, before the Secretary made a final decision." *Hesai*, 186 F.4th at 881. At a minimum, this information raises serious questions regarding the Department's designation. The Court "'cannot presume' that an opportunity to respond before the Secretary's decision became final would have had no effect." *Id.* Alibaba has thus been prejudiced by the Department's failure to provide due process.

**C. Vacatur is the appropriate remedy.**

Because the Department failed to provide sufficient pre-deprivation process, the designation must be vacated. The APA directs that unlawful agency action "shall" be "set aside." 5 U.S.C. § 706(2). Vacatur is therefore the "default remedy," and courts in this Circuit depart from it only in "limited circumstances." *Mont. Wildlife Fed'n*, 127 F.4th at 50. Ultimately, "[w]hether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" Both factors point toward vacatur.

*First*, the Department's errors are "serious" and hardly "minor procedural mistakes, such as failing to publish certain documents in the electronic docket." *California v. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1125 (N.D. Cal. 2017). It consciously chose to withhold notice and an opportunity to be heard without any special need, *see* AR0002; AR1787, which resulted in an arbitrary, capricious, and unlawful designation. *See* Part I, *supra*. There is little reason to think there is a quick fix for its substantive errors given the Department's misreading of Section 1260H and the thin record produced. *See Nat. Grocers v. Rollins*, 157 F.4th 1143, 1170 (9th Cir. 2025).

*Second*, vacatur will not cause "irreparable and severe disruptive consequences." *California*,

277 F. Supp. 3d at 1125. This would not be a situation "where vacatur could result in the extinction of an already endangered species," *id.* at 1126 (citing *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405–06 (9th Cir. 1995)), or "in rolling blackouts affecting thousands, if not millions of people, more air pollution, and disastrous economic effects," *id.* (citing *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012)). The Department would still generally be able to "maintain the Section 1260H list, identify Chinese military companies, or protect defense supply chains from foreign influence." *WuXi*, 2026 WL 2279624, at *15. All that would change is "this particular designation, on this particular record." *Id.* In contrast, refusing to vacate would ensure that Alibaba continues suffering harm, including constitutional harm, while the Department reassesses the designation. That is particularly concerning given that the Department has not provided any reason to expect that process to be completed promptly. It never decided the reconsideration requests filed after the January 2025 list, sitting on them until the next list rendered them moot. AR0003. Vacatur, however, would restore Alibaba—and only Alibaba—to where it stood before the Department acted unlawfully. *See ASSE Int'l, Inc. v. Kerry*, 182 F. Supp. 3d 1059, 1065 (C.D. Cal. 2016). The Court should grant the default relief—vacatur.

## III. Section 4663's Lobbyist-Contracting Ban Violates The First Amendment.

As this Court has already recognized, Dkt. 51 at 10–11, the First Amendment protects the right to political speech, to petition the government, and specifically to lobby public officials. *See FTC v. Super. Ct. Trial Laws. Ass'n*, 493 U.S. 411, 426 (1990); *Miller v. Ziegler*, 109 F.4th 1045, 1049 (8th Cir. 2024). Section 4663 infringes those freedoms—for Alibaba, for other designated entities, and for the lobbyists who wish to represent them—by barring the Department from contracting with any entity that retains a lobbyist who represents a CMC. 10 U.S.C. § 4663. The government cannot satisfy its burden to justify those infringements under strict or intermediate scrutiny. The statute is thus unconstitutional as applied to Alibaba, *see* Dkt. 51 at 20–21, and, on the record now before the Court, facially overbroad.

### A. The statute burdens First Amendment freedoms.

Section 4663 infringes Alibaba's ability to communicate, through its chosen advocates, with

Congress and the Executive Branch about "Federal legislation," any "Federal rule, regulation, Executive order," or federal programs and policies. 2 U.S.C. § 1602(8)(A); *see* 10 U.S.C. § 4663(d)(2). The statute bars the Department from contracting with "an entity, a parent company of such entity, or a subsidiary of such entity if such entity is a party to a contract with a covered lobbyist," meaning any entity that "engages in lobbying activities" for a CMC. 10 U.S.C. § 4663(a), (d)(1). It thus forces every lobbying firm to choose: lose a designated entity client or every other client that holds or seeks a Department contract. As the Court recognized, "[t]he only rational choice for a lobbying firm is to stop representing Alibaba." Dkt. 51 at 14.

That is precisely what happened. Every one of the more than two dozen lobbyists registered to represent Alibaba withdrew, and multiple firms told Alibaba that Section 4663 was the reason. Dkt. 22 ¶¶ 28–29. Even after the Department, under the stipulated order, stopped treating Alibaba as a CMC for purposes of Section 4663, those firms declined to return, and Alibaba has not been able to bring back its prior firms or retain other established firms with equivalent expertise to lobby on the myriad issues of concern to Alibaba. Dkt. 38 ¶¶ 2–7, 9–12; *see* Dkt. 22 ¶ 26; Pelletier MSJ Decl. ¶¶ 34–36.

None of the government's reasons for avoiding scrutiny holds up. That the burden reaches Alibaba through third parties is irrelevant: "a government official cannot do indirectly what she is barred from doing directly," *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024); *see Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963), and the firms' withdrawals are "the predictable effect of Government action on the decisions of third parties," *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019); *see* Dkt. 51 at 11–12, 14–15. That Alibaba might lobby on its own or find another firm is equally irrelevant because a law that leaves open "more burdensome" avenues of communication "does not relieve its burden on First Amendment expression." *Meyer v. Grant*, 486 U.S. 414, 424 (1988); *see* Dkt. 51 at 12–13. And *TikTok Inc. v. Garland*, which assumed that First Amendment scrutiny applied, 604 U.S. 56, 69 (2025), does not exempt laws concerning foreign adversaries. That is especially so for a law that, unlike the corporate-control law there, is "designed to ... insulate Department decision-makers from the potential influence" of a class of speakers. Dkt. 34 at 15; *see* Dkt. 51 at 13–14.

**B. Strict scrutiny applies.**

Section 4663 is subject to strict scrutiny for three independent reasons: it burdens political speech, it is content based, and it discriminates based on the speaker's identity. Each suffices.

*First*, "[l]aws that burden political speech are 'subject to strict scrutiny.'" *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). That rule applies whether or not the law is otherwise content neutral. *See Miller*, 109 F.4th at 1050 n.1. As the Court observed, the political character of the speech that Section 4663 burdens is enough by itself to trigger strict scrutiny. *See* Dkt. 51 at 17 & n.13.

*Second*, Section 4663 is content based on its face. It "applies to particular speech because of the topic discussed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). In *FCC v. League of Women Voters of California*, 468 U.S. 364 (1984), the Court considered a statute barring one class of speakers, public broadcasters receiving federal grants, from editorializing. The Court held that the statutory restriction was content based because its scope turned on the content of the suppressed speech: "[a] regulation that denies one group of persons the right to address a selected audience on 'controversial issues of public policy' is plainly such a regulation." *Id.* at 384. Section 4663 has the same structure. It denies one group of persons, designated CMCs, the ability to address a select audience, federal officials, through retained advocates on a defined set of subjects: federal legislation, rules, regulations, executive orders, and federal programs and policies. 10 U.S.C. § 4663(d); 2 U.S.C. § 1602(7)–(8). Firms that represent designated CMCs on other matters are untouched.[4] Under *League of Women Voters*, then, Section 4663 is content based, and following *Reed*, content-based laws are "presumptively unconstitutional" and subject to strict scrutiny. 576 U.S. at 163.

*Third*, Section 4663's speaker-based distinctions independently require strict scrutiny. Speaker-based laws "demand strict scrutiny when they reflect the Government's preference for the

[4] At the preliminary-injunction stage, the Court concluded that Section 4663 was a speaker-based restriction, not a content-based one. Dkt. 51 at 16 n.12. Respectfully, it is both. The statute first draws distinctions between advocates who represent designated CMCs and advocates who do not; it then draws a further distinction based on what advocates for designated CMCs discuss with government officials, *see* 10 U.S.C. § 4663(d)(2) (lobbying activities). It thus makes content-based *and* speaker-based distinctions.

substance of what the favored speakers have to say" and an "aversion to what the disfavored speakers have to say." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994). Section 4663 reflects exactly that aversion. In the government's words, the statute is "designed to … insulate Department decisionmakers from the potential influence of Chinese military companies" and to "ensur[e] that the Department's decision-making … is free from influence that could potentially give China a military advantage." Dkt. 34 at 15, 17. An interest in keeping a disfavored speaker's advocacy from influencing its audience is an interest in "the direct impact of speech on its audience," and that is not a content-neutral justification. *Boos v. Barry*, 485 U.S. 312, 321 (1988). Because "the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue," a law that does both must pass strict scrutiny to be valid. *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 784–85 (1978).

**C. The government cannot satisfy strict or intermediate scrutiny.**

Under strict scrutiny, the government must prove that Section 4663 "furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 558 U.S. at 340. It must "specifically identify an 'actual problem' in need of solving," and "the curtailment of free speech must be actually necessary to the solution." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). The government can show neither.

*First*, the government has identified no actual problem. It asserts two interests: preventing CMCs from obtaining sensitive military information through shared lobbyists and preventing CMCs from influencing Department decisions. Dkt. 34 at 18. National security is compelling in the abstract, but the government must "point to record evidence or legislative findings demonstrating the need to address a special problem." *FEC v. Cruz*, 596 U.S. 289, 307 (2022) (cleaned up). Its only support has been the Joint Explanatory Statement. Dkt. 34 at 14. That statement identifies no instance of a shared lobbyist compromising military information or Department decisionmaking. It instead directs the Comptroller General to study a different problem, the risks posed by consulting firms that contract with both the Department and the Chinese government, and to assess whether the Department has evaluated those risks at all. 170 Cong. Rec. H6639 (daily ed. Dec. 10, 2024); Dkt. 51 at 18. Deference cannot fill that gap. *Holder v. Humanitarian L. Project* deferred to specific

congressional findings and an Executive Branch evaluation, 561 U.S. 1, 29–36 (2010), and there are none here, *see* Dkt. 51 at 18–19. The second interest fails for an additional reason. A government that "finds expression too persuasive" may not "quiet the speech or … burden its messengers." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578 (2011).

*Second*, Section 4663 is not narrowly tailored. It is overinclusive: it applies whether or not the firm lobbies the Department, whether or not anyone at the firm has access to sensitive information, and whatever the subject of the lobbying. A firm that speaks to Congress for Alibaba about trade policy is treated the same as one embedded in defense procurement. It is also underinclusive. It leaves CMCs free to deal directly with defense contractors, and it ignores lawyers, accountants, and consultants who serve both on anything other than lobbying. "[A] law cannot be regarded as protecting an interest of the highest order … when it leaves appreciable damage to that supposedly vital interest unprohibited." *Reed*, 576 U.S. at 172. Less restrictive alternatives are obvious. They include disclosure requirements like Nebraska's, Neb. Rev. Stat. § 49-1480(1)(a)(vi); *see Citizens United*, 558 U.S. at 369; the Department's existing classification, clearance, and nondisclosure regimes; and case-by-case review of the kind the statute's own waiver provision contemplates, 10 U.S.C. § 4663(c). The government bears the burden "to prove that the proposed alternatives will not be as effective." *Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004). Its only response has been that "there would still be access and the potential for influence." Dkt. 34 at 18. That is speculation, not proof. Dkt. 51 at 19–20.

*Third*, Section 4663 would fail even intermediate scrutiny. The government still must show that "the recited harms are real, not merely conjectural," *Turner Broad.*, 512 U.S. at 664, and that the statute does not "burden substantially more speech than is necessary," *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). For the reasons just given, it can do neither. Dkt. 51 at 20–21. Section 4663 therefore violates the First Amendment as applied to Alibaba.

**D. The statute is facially overbroad.**

A law is facially invalid under the First Amendment if "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (cleaned up). The inquiry asks first "[w]hat

activities, by what actors" the law covers and then which applications violate the First Amendment, measured "against the rest." *Id.* at 724–25. The Court previously found it "conceivable that every CMC may be subject to the same restriction," but declined to decide the question without a record on the statute's other applications. Dkt. 51 at 21–22. That record now exists.

Section 4663 operates in essentially one way: it forces lobbying firms to choose between representing CMCs and keeping any client that holds or seeks a Department contract. In the first quarter of 2026, firms filed Lobbying Disclosure Act reports for at least eight listed companies besides Alibaba. Those reports show, for example, that several firms reported receiving over $1 million in total from Tencent to lobby the Department and the White House about Section 1260H; that a firm reported receiving nearly $100,000 from Quectel Wireless Solutions Co., Ltd. to provide strategic counsel on policy and regulatory action concerning the Internet of Things; and that a firm reported receiving approximately $50,000 from a subsidiary of CRRC Corporation Limited to lobby the Department of Homeland Security on transportation issues. *See* Eisworth Decl., Exs. E–I.

The public filings also show that Section 4663 affected these listed companies just as it affected Alibaba. Each of the three had been on the 1260H List since January 2025 or earlier, and their lobbyists took them on as clients and kept representing them for months after designation. Those representations abruptly ended—and the lobbyists deregistered—shortly after the Department published the June list and before Section 4663 took effect. *Id.*, Exs. J–N. In other words, designation did not sever those relationships; Section 4663 did. And the effects are not limited to companies with existing lobbyist relationships. BYD Motors has attested that two firms it approached following its designation each declined to lobby on its behalf. *See* Mot. for Prelim. Inj. at 9, *BYD Motors LLC v. Dep't of Def.*, 26-cv-11173 (C.D. Cal. Oct. 26, 2026), Dkt. 15 (citing declaration).

Each of those applications is unconstitutional for the same reasons the statute is unconstitutional as applied to Alibaba. Each burdens a listed company's political speech and petitioning on every subject of federal policy, including Section 1260H itself. *See* Part I.A, *supra*. Each also burdens the lobbying firms' own right to petition on behalf of clients of their choosing. *See Miller*, 109 F.4th at 1050–51; *Autor*, 740 F.3d at 182. And each rests on the same unproven

justification and the same mismatch between means and ends. *See* Part I.C, *supra*. The government has never identified a constitutional application of the statute, let alone enough of them to outweigh the rest. Even if some application could survive, it would be a narrow core dwarfed by the statute's reach, and one that existing classification and clearance rules already address. Finally, the firms' response shows the chill that the overbreadth doctrine guards against. Rather than challenge the statute, they complied and terminated their representations at considerable financial cost. *See United States v. Hansen*, 599 U.S. 762, 770 (2023).

Because Section 4663 burdens every listed company, and every firm that would represent one, in the same way and for the same reasons, its unconstitutional applications substantially outweigh any legitimate sweep. The Court should hold that Section 4663 is facially overbroad.

## IV. Section 1260H Is Void for Vagueness.

If the Court nonetheless were to find that Alibaba was properly designated as a CMC, then Section 1260H is void for vagueness. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The void-for-vagueness doctrine addresses at least two critical concerns: "first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Fox Television*, 567 U.S. at 253. It accordingly requires that laws provide fair notice of what they prohibit and meaningful standards to guide enforcement. *See id.* If Section 1260H reaches Alibaba, it does neither.

*First*, the statute fails to provide companies fair notice of what type of relationships trigger designation. The statute covers entities "affiliated with" SASAC or MIIT and defines "affiliated with" as "in close formal or informal association." § 1260H(g)(2)(B)(i)(I), (g)(3)(B)(i), (g)(1). If the attenuated connections at issue here are enough, the terms "affiliated with" and "close formal or informal association" know no intelligible bounds. Countless ordinary commercial relationships could trigger designation, with no discernible limit. Such indeterminacy cannot be squared with the vagueness doctrine. *See Lanzetta v. New Jersey*, 306 U.S. 451, 456–58 (1939) (invalidating statute

penalizing persons "known to be a member of any gang" because it "fail[ed] to indicate what constitutes membership"); *cf. Bridges v. Wixon*, 326 U.S. 135, 139–41, 146–47 (1945) (rejecting "broad, fluid" construction of "affiliation" under which cooperation with a labor union allegedly affiliated with the Communist Party would itself establish affiliation with the party).

*Second*, the Department's interpretation would invite arbitrary enforcement. If attenuated connections suffice to establish affiliation with a government body, without identifying what makes those relationships sufficiently close, the statute leaves the Department free to decide which qualify. It could designate one company based on routine commercial dealings while sparing another engaged in identical activities. That lack of "clear standards" to guide enforcement is precisely the sort of discretion the vagueness doctrine forbids. *County of Santa Clara*, 250 F. Supp. 3d at 535. Indeed, a court invalidated an undefined "otherwise associated with" criterion for national-security designations because it supplied no meaningful standards for designation decisions. *Humanitarian L. Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049, 1070 (C.D. Cal. 2006), *modified on other grounds*, 484 F. Supp. 2d 1099, 1103–06 (C.D. Cal. 2007), *aff'd*, 578 F.3d 1133 (9th Cir. 2009). If "affiliated with" reaches the attenuated relationships invoked here, it likewise confers unconstitutionally broad discretion.

**CONCLUSION**

For the foregoing reasons, the Court should grant summary judgment to Alibaba and against Defendants on each claim.

Date: November 9, 2026

SIDLEY AUSTIN LLP

*<u>/s/ Christopher A. Eiswerth</u>*
Sheila A.G. Armbrust (CABN 265998)
Carter G. Phillips (admitted *pro hac vice*)
Jennifer J. Clark (admitted *pro hac vice*)
Christopher A. Eiswerth (admitted *pro hac vice*)

*Attorneys for Plaintiffs Alibaba Group Holding Limited and Alibaba Group (U.S.) Inc.*

**GENERATIVE AI CERTIFICATION**

I certify that any content generated by artificial intelligence in the foregoing motion and accompanying papers has been personally verified for accuracy and any prompts have been retained.

*/s/ Christopher A. Eiswerth*
Christopher A. Eiswerth

*Attorney for Plaintiffs Alibaba Group Holding Limited and Alibaba Group (U.S.) Inc.*